**STATE of Missouri, Respondent,**

v.

**Monte Ray DENMON, Appellant.**

**No. 62674.**

Supreme Court of Missouri,
Division No. 2.

July 6, 1982.

Gary L. Gardner, Asst. Public Defender, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Sara Rittman, Asst. Atty. Gen., Jefferson City, for respondent.

HIGGINS, Judge.

Monte Ray Denmon was convicted by a jury of two counts of murder in the first degree, § 559.007, RSMo Supp.1975; assault with intent to kill with malice aforethought, § 559.180, RSMo 1969; and manslaughter, § 559.070, RSMo 1969. The court fixed his punishment under the Second Offender Act, §§ 556.280 and 556.-290, RSMo 1969, at life imprisonment for each count of murder in the first degree; life imprisonment for assault with intent to kill with malice aforethought; and ten years' imprisonment for manslaughter. The sentences were imposed to run consecutively. Appellant assigns error to refusal of his impeachment of a State's witness; permitting the State to read the transcript of a witness's prior recorded testimony; and the failure of the State to correct a witness's testimony. Affirmed.

Appellant does not question the sufficiency of evidence to sustain the convictions. He states evidence which would permit a jury to find:

At 9:30 a. m. on April 26, 1977, in apartment number 58 of the Canterbury Apartments in Grandview, Missouri, were found the dead bodies of Calvin Brown, a general contractor and narcotics distributor and dealer, Janet Blewett, his paramour, and Christine Wolfskill, wife of the surviving person in the apartment, Bernard Wolfskill, a longtime drug addict. An electric clock, stopped at 3:19 with its cord cut off, was found in the blood-splattered apartment. Also found in the apartment were rolls of adhesive tape, three butcher knives with a red substance on them, plastic bags and a box containing heroin, cocaine, and marijuana, and two food blenders with heroin in them. A safe in the apartment contained thirty-seven rings. Calvin Brown had a four inch deep incising wound to the right side of his neck, made from front to back, which went to his spine and cut his blood vessels. He had a skull fracture with bone driven into the right temporal lobe of his brain. His death was caused by the incising wound to the neck with external hemorrhaging. Janet Blewett, who was five months pregnant, had a ligature wound on the left side of her neck and an incising wound in her upper abdomen. Her death was caused by the incising wound to the abdomen with internal hemorrhaging. Christine Wolfskill had incising wounds to both sides of her neck. Her death was caused by that wound with external hemorrhaging. A neighbor in the apartment below had been awakened at 3:00 a. m. that morning by female screams and noise from the apartment above.

Thurman Simmons, a twice-convicted felon, agreed to testify for the State about his, defendant's, and defendant's wife's participation in these murders, in exchange for not being prosecuted for the murders and other matters. Simmons and Lehman White had gone to a drug house at 6:00 p.m. on April 26, 1977, to buy drugs. Defendant was there with his wife. The four discussed going into the drug business together by committing a robbery in Kansas to get some money. At 10:30 p. m. the four left a club, where they had gone at 8:00 p. m. for defendant's brother's birthday party, in two separate cars with two weapons to

commit a robbery. This plan was abandoned while driving around in Kansas because defendant suggested that he had a plan for making some money and getting drugs. They returned to the birthday party at 1:00 a. m. where Lehman White deserted them. Simmons, defendant, and his wife then went to a continuation of the birthday party at a home. While there, defendant's wife called Calvin Brown about coming to his home and buying drugs. The plan was to rob and kill Calvin Brown. The three next returned to the drug house to meet Lehman White who never appeared. They then went to Calvin Brown's in two separate cars with two weapons. They arrived at 2:30 a. m.

The plan was to have defendant's wife knock on the door, and when it was opened, Simmons and defendant, both wearing ski masks, would rush in. Defendant's wife went in, however, before the others could rush the door. They waited by the door, and when it was opened, they ran in with guns drawn and announced a stick-up. Simmons grabbed Wolfskill and defendant grabbed Brown. They threw the victims on the floor and taped their hands behind their backs. Janet Blewett came from another room in the apartment; she was also bound. The robbers found heroin and marijuana, eighteen thousand dollars in two tin boxes, and some rings which defendant took. An electrical cord was wrapped around Janet Blewett's neck; defendant and Simmons pulled on its ends. They gave up, defendant got a butcher knife and stabbed her in the stomach. Defendant then cut Calvin Brown's neck. A knock came at the door; defendant's wife let Christine Wolfskill in and defendant cut her neck. They left at 3:30 or 4:00 a. m., split the money, shot up the drugs, and defendant kept the rings in a white cloth.

The survivor, Bernard Wolfskill, also testified to these events, but claimed that three men in ski masks rushed into the apartment, one of them being defendant. He described how defendant stabbed him in the chest and neck, leaving the knife imbedded, and leaving him for dead. Defendant called Wolfskill while he was in the hospital and told him that he would finish the job.

When defendant was arrested, he was wearing a wrist watch, three rings and a necklace, and he used a white handkerchief. In the trunk of the car in which he was arrested were found four rings in a white cloth. Calvin Brown's mother identified three of the rings from the car, and the watch defendant was wearing, as her son's. Blood was found on the handkerchief matching that of Christine Wolfskill. Defendant's wife's fingerprints were found on a waterpik in Calvin Brown's apartment.

Defendant testified and denied committing the offense; he claimed he was at his brother's party. He explained the drug business and his relationship with Calvin Brown. He explained possession of Brown's watch and rings by stating that he had taken them from Thurman Simmons, who had involved his wife in Brown's murder since his wife was making a drug purchase at Brown's apartment when the events occurred.

## I.

Appellant claims the trial court erred in refusing to permit impeachment of Wolfskill's statement that defendant committed the murders with his prior inconsistent statement made to Public Defender James Fletcher that he could not identify anyone in the house. He argues that a proper foundation was laid for admission of the impeaching statement to be adduced in Fletcher's testimony. He asserts that even though Wolfskill had not been asked whether he recalled telling Fletcher he could not identify anyone in the house, the foundation for impeachment was satisfied by asking Wolfskill whether he recalled the attorneys asking him whether he could identify any of the people at the house and Wolfskill's denial of the conversation upon cross-examination.

On cross-examination the following line of questioning was pursued:

Q. Do you know a person by the name of Jim Fletcher?

A. It sound like a lawyer.

\* \* \* \* \* \*

Q. Do you recall talking to him and a man by the name of Lee Nation, who is another attorney, at your home in October '78?

A. Yes, I recall coming there.

Q. You recall them coming there?

A. Umhum.

\* \* \* \* \* \*

Q. And you recall them asking you whether or not you could identify any of the people who was at that house, isn't that correct?

A. No, I recall them pulling out a tape recorder and asking could they tape the statement and I said, "No," they couldn't tape it.

\* \* \* \* \* \*

Q. After that, isn't it true you talked to them about—

A. No, I put them out.

Q. You didn't talk to them at all?

A. No, he said—

\* \* \* \* \* \*

Q. Did you talk to them?

A. I put them out. On the way out he said, "Just between you and me, is Monte Ray guilty?" and I said, "yes."

\* \* \* \* \* \*

Q. That was the only conversation you had as they were going out the door?

A. I put them out, yes.

■ Appellant argues that Wolfskill's denial that Fletcher asked him the question and of any conversation is tantamount to a denial that he told Fletcher he could not identify anyone in the house. This is incorrect. The trial court properly restricted the questioning of Mr. Fletcher to whether he had a conversation with Wolfskill and whether Wolfskill was asked if he could identify any of the assailants because only these specific questions were propounded on cross-examination of Wolfskill. Impeachment may be made only where the witness has been asked the specific question upon

which he is sought to be discredited. *State v. Haynes*, 482 S.W.2d 444 (Mo.1972); *State v. Dent*, 473 S.W.2d 370 (Mo.1971); *State v. Hughes*, 460 S.W.2d 600 (Mo.1970). No proper foundation was laid for prior statement. Because Wolfskill was not asked, on cross-examination, if he had denied his ability to recognize the defendant, Fletcher could not subsequently testify to that denial. Therefore no foundation was laid to impeach Wolfskill on this specific point. Denying the conversation and the question is not the same as denying that the statement was made.

## II.

Appellant contends the trial court erred in permitting the State to read into evidence at trial the transcript of Thurman Simmons's testimony, recorded at defendant's prior trial,[1] because the State failed to show a good faith effort to obtain Simmons's presence. Appellant claims that because the State failed to seek out the people most likely to know Simmons's whereabouts, and because the State waited until early 1980 to attempt to locate Simmons, no good faith effort was made. He asserts, therefore, that his right to confront and cross-examine Simmons has been violated.

■ The right of confrontation and cross-examination is an essential and fundamental requirement for a fair trial. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); Mo.Const. art. I § 18(a). An exception exists where a witness is unavailable and has given testimony at prior judicial proceedings against the same defendant which was subject to cross-examination by defendant. A witness is not unavailable unless the prosecutor has made a good faith effort to obtain his presence at trial; and the State must show the exercise of reasonable diligence to secure attendance of the witness at trial. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255

1. Defendant had been tried and convicted in 1978 for these offenses. The judgment was reversed and the cause remanded, *State v. Den-* *mon*, 595 S.W.2d 769 (Mo.App.1980), under the authority of *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

(1968); *State v. Murphy*, 592 S.W.2d 727 (Mo. banc 1979); *State v. Johnson*, 618 S.W.2d 191 (Mo.1981).

The court's ruling comported with the foregoing cases on the factual showing made in this case. The State had contact with Simmons sometime in late 1979 or early 1980 before the remand of defendant's prior conviction. The prosecuting attorney told Simmons to call the office immediately if his address changed or if he moved, and there was no reason to believe that Simmons would not inform of any change of address because he had been cooperative up to and including that time. When notice of the remand of defendant's prior conviction was received, the prosecuting attorney assigned the case and requested that Simmons be located. The St. Louis County Sheriff's Department checked for Simmons approximately twelve times at the address in Berkeley, Missouri, shown on the subpoena received from the Jackson County Prosecutor's Office; ultimately the subpoena was left with Simmons's stepmother. Simmons's mother lived in Kansas City, Missouri. An investigator talked with her on the phone and went by her home on several occasions to attempt to locate her son. She told the investigator that Simmons had called her from Kansas and had told her that he was going to Denver, Colorado. The Kansas City, Kansas, police unsuccessfully searched for Simmons upon an informant's lead.

Another investigator from the prosecutor's office ran Simmons's name through a computer and checked with the Social Security Office in order to determine whether Simmons had been employed during the previous fiscal year. He was unable to locate any employment records on Simmons. On July 23, 1980, a member of the Grandview Police Department obtained a warrant for Simmons's arrest at the request of the prosecuting attorney. The officer then entered the warrant into the NCIC computer which makes the warrant information available to any law enforcement agency that has a computer terminal anywhere in the United States.

During the first part of September 1980, several weeks before trial, Simmons talked with his mother and she advised him that the prosecutor's office wanted him to appear as a witness. At the trial when the State wanted to call Simmons as a witness, the prosecuting attorney's office had still not been able to locate him.

■ This recital of the State's efforts to locate Simmons demonstrates good faith exercised in attempting to secure the presence of Simmons at trial. The State exercised due diligence and the trial court did not err in permitting the State to read Simmons's prior recorded testimony. *State v. Murphy*, 592 S.W.2d 727 (Mo. banc 1979).

### III.

Appellant claims the failure of the State to correct Bernard Wolfskill's testimony that he had not talked to Assistant Prosecutor Dakopolos about his son's pending charge to show that Wolfskill had contacted someone in the prosecutor's office rendered his trial fundamentally unfair. He argues that the State failed to engage in fair play by not admitting contact with the prosecutor's office, even though the question directed to Wolfskill by defendant's counsel was whether he had contacted Dakopolos concerning his son's pending charge.

■ A conviction obtained through the use of false evidence, known to be such by the State, must fall under the Fourteenth Amendment; the same result obtained when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). In this case, however, no false evidence was adduced. Wolfskill was asked whether he had contacted Mr. Dakopolos; he answered that he had not talked with Dakopolos about his son. There was no false evidence for the State to correct; and although the State has a duty to disclose evidence affecting the credibility of a witness when the reliability of the witness may be determinative of guilt or innocence, *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31

L.Ed.2d 104 (1972), the State here had revealed Wolfskill's contact with the prosecutor's office during a pre-trial proceeding. Defendant had the information with which to correctly test Wolfskill's credibility. No false evidence having been adduced, appellant cannot complain of the State's failure to correct, or explain, truthful testimony which he elicited following the State's complete disclosure.

The judgment is affirmed.

WELLIVER, P. J., and SEILER, J., concur.