STATE of Missouri, Respondent,

v.

Jerry Roland LINDSAY, Appellant.

No. WD 36005.

Missouri Court of Appeals,
Western District.

April 1, 1986.

Rehearing Denied May 22, 1986.

Application to Transfer Denied
July 15, 1986.

Dan K. Purdy, Osceola, for appellant.

William Webster, Atty. Gen., Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for respondent.

Before LOWENSTEIN, P.J., SHANGLER, J., and SOMERVILLE, Senior Judge.

SHANGLER, Judge.

The defendant Jerry Lindsay was convicted by a jury of the second degree murder of one Betty Malson, and was sentenced to a term of fifty years. The court received into evidence the transcribed preliminary hearing testimony of absent witness for the prosecution, Charles Clapp. The defendant contends there was an absence of due diligence by the prosecutor to procure the attendance of the missing witness, and hence the admission of the testimony given by Clapp in the previous criminal proceeding denied the defendant the right of confrontation under the Sixth Amendment of the United States Constitution and Article 1, § 18(a) of the Missouri Constitution.

On Easter Sunday, in April of 1983, the Whitt brothers discovered a body afloat in a strip pit near Appleton City. They went to the police and returned with them to the site, joined by Sheriff Collins of St. Clair County. The body retrieved from the pit was of a nude woman with a heavy log chain wrapped around the neck. The autopsy disclosed that the body was of an obese woman and examination revealed a laceration on the right side of the chest, nine centimeters long. The wound extended into the right pleural cavity. The body and organs were in a state of deterioration, but the pathologist was able to give opinion that the death was caused by a forceful stab wound to the chest. A dental comparison revealed that the victim was Betty Malson.

The prosecution proved the offense through a number of witnesses, the principal among them was Charles Clapp, who was missing at the time of trial. His evidence—testimony given at the preliminary hearing and [at the insistence of the defense], prior statements given to the police—was received by the court after the prosecution proved cause for its admission. It was these statements which directed the police inquiry to the body recovered months before near Appleton City, and which then ended in the identification of the victim through dental charts. Clapp had come to the Grandview police station on September 21, 1983 to initiate a complaint of assault against a former wife. In the course of that narrative of complaint, Clapp disclosed to the officer King the details of an event the year before in November of 1982. The statement related to his knowledge of the murder, in that November, of a woman named "Betty" in a strip pit near Appleton City.

The essential proof of the offense against defendant Lindsay, however, was the transcript testimony of witness Clapp given at the preliminary hearing. On November 26, 1982, the defendant Jerry Lindsay phoned Clapp to come over to his house. A woman there had $6,000, and there was a job he wanted Clapp to do. [Clapp was married to a Lindsay niece some time ago, and had known him for 20 years.] Lindsay had been insistent about a visit for the past week, so Clapp agreed. When he arrived at the residence, at about 4:00 p.m., Lindsay was alone. Soon, Sharon Lindsay [wife of defendant] and Betty Malson drove up in a white Vega. Clapp [according to his testimony] did not know Betty Malson, and she was introduced simply as "Betty." The four of them commenced to drink. Clapp confined his consumption to beer—a total of 3 or 4 for the evening—but the others had whiskey also. Later on, Ted Lindsay [brother of defendant] joined them and brought a guitar for Clapp to tune. Ted and Jerry drank heavily and soon commenced to fight. They screamed and shouted at each other and when Clapp attempted to intervene, he was told to shut up.

Jerry and Sharon became angry at Betty because she refused the use of the Vega to purchase more liquor. Jerry then reached for a bottle of Valiums which belonged to Betty, who remonstrated: "You s.o.b., those are mine." She grabbed for them and they fought over them. The defendant Lindsay slapped Betty, slammed her down on the couch and told her to shut her mouth. She retorted: "Don't hit me, you s.o.b. I'll call the police on you." The defendant grabbed her and slapped her and said: "You ain't going to the police on me." [Lindsay was then on probation on suspended concurrent sentences of 25 years each for rape and for sodomy.] The strife ceased for a while, but the argument between them rekindled and Jerry slapped her again. The contention between the brothers Jerry and Ted also resumed. It was then Betty remarked to Clapp: "Get me away from these sick-o's." The comment was overheard by one of the Lindsay boys who reported it to the defendant, his father. At that, the defendant went over and slapped Betty. It was then that Clapp and Betty attempted to leave, but the defendant refused to allow Betty to leave, and hid the telephone from her, as well. Then, some minutes later, Clapp got into his vehicle [a pickup truck] to leave, but Lindsay, with a stream of vile invective, shouted at Clapp: "[Y]ou ain't going nowhere ... you ain't leaving me here with this drunken bitch." Finally, the three of them—Clapp, Lindsay and Betty Malson—left in the Clapp pickup, but not before one of the Lindsay boys, at the direction of his father, placed a log chain in the back of the truck.

They stopped for fuel in Grandview [where Lindsay argued with the station attendant], and then headed south toward Appleton City. Lindsay directed Clapp to a strip pit behind the cemetery. Here, Lindsay told Betty to get out of the truck and to disrobe because they were going to "screw" her. She protested, but complied. Lindsay took Betty behind the truck, and placed a knife to her throat. Lindsay acted as though in a frenzy, telling Betty that she wasn't going "to call the police on him." Lindsay then told Clapp to put the chain on Betty, and as he did so, he told Betty to hide and that he would talk to Lindsay. Lindsay grabbed Clapp and scolded him—that Clapp didn't care if "this bitch gets me 50 years." Clapp put the chain around the neck of the victim, but Lindsay was dissatisfied—"that will come off"—and clamped the log hook onto the chain, and screamed and slapped at her as he did. Clapp begged Lindsay for them all to leave, but he told Clapp to shut up and resumed to scream at Betty. Clapp thought Lindsay was going to beat Betty just to scare her and went over to intercede, but before he got there, Lindsay hit her in the stomach and she fell down. By the time Clapp reached them, Betty had disappeared and Lindsay was standing up with a knife in his hand. When Clapp next saw Betty, she was standing in the water of the strip pit below the road on which the

truck stood. Lindsay then rushed past Clapp [who was crouched down by the road], threw the knife down, jumped into the water and held Betty down under the surface. When Lindsay emerged from the water, he told Clapp: "You can't save her. It's too late. She's gone." Clapp searched for her in the water, but without success. Lindsay and Clapp then left the cemetery, and returned to Kansas City.

The next day, Jerry and Sharon Lindsay came by the Clapp residence in the white Vega owned by the victim. They brought some of her belongings and burned them in the fireplace. Two days after the homicide, the Lindsays and Clapp drove to the scene in the white Vega to look for the shoes of the victim, [which they found]. While there, they picked up some beer cans. Lindsay had mentioned the death incident to Clapp several times since the event, and threatened Clapp should he tell any one.

The transcript of the cross-examination of Clapp at the preliminary hearing was then read into evidence by defense counsel, as were several other statements by Clapp to the police, a handwritten statement dated October 11, 1983 signed by Clapp, among them. These sources of proof disclosed a number of inconsistencies. They all agreed, however, as to these essentials: On that day in November of 1982, Lindsay summoned Clapp to his residence; once there, he was introduced to "Betty." Those present—Ted Lindsay, Jerry Lindsay, Sharon Lindsay and Betty—all drank and argued quite a lot. Lindsay was annoyed with Betty for her threat to report him to the police. Later, Clapp, Jerry Lindsay and Betty left in the pickup truck. They drove to Appleton City where, on a road next to a strip pit and near the graveyard, Jerry Lindsay fastened a chain around the naked Betty, struck her [apparently with a knife] and held her under water in the strip pit.[1] Lindsay then emerged from the water, exclaimed that he had killed Betty, and threatened Clapp not to talk of the incident.

The testimony and statements given by Clapp were corroborated by Bill Miller. He had lived with the Lindsay family intermittently during the past five years and worked with Lindsay on construction jobs. Miller knew Betty Malson. Lindsay had introduced him to her when Miller helped Lindsay move some of her furniture into the Lindsay house. Miller never saw her again. When he asked Lindsay about her, Lindsay first told him that she had gone to Texas with a man, but later admitted he had "done away" with Betty Malson. Lindsay described that he and Clapp put a chain and logging hooks around Betty. Miller identified the chain found around the victim as a chain he had seen Lindsay use. Lindsay told Miller also that he stabbed the victim twice and threw her into the pit there, at Appleton City. Lindsay mentioned the incident to Miller virtually every month. Miller saw Lindsay drive the Malson car. Lindsay told him he had purchased the white Vega from Betty, but later admitted that he had signed the car over to his wife who then gained title on a forged signature. Miller acknowledged a varied criminal record and penitentiary imprisonment.

Cross-examination disclosed that Miller was a heavy drinker and suffered some memory loss as a result. He was shown to have shared a jail cell with Clapp on November 28, 1983 [the day of the preliminary hearing]. Miller and Clapp, in fact, had discussed the testimony Miller was about to give in the case.

The prosecution presented also August Nilges, a handwriting expert, who gave opinion that the signature which transferred title to the Vega was a forgery. The basis of the opinion was a comparison between the signature on Missouri operators

---

1. The official report of Officer King dated September 21, 1983, recites the Clapp statement that he drove off and left Lindsay and Betty behind after he saw Lindsay strike her. Clapp in the subsequent interview with Detective Boone [October 10, 1983] explained, however, that he had lied about that aspect of the events in the first statement to Officer King because he was afraid that would implicate him in the murder.

license and the signature on the motor vehicle title document.

The defense presented a number of witnesses. Ted Lindsay, brother of the defendant, testified to the events at the Lindsay home while he was there that day. Ted recounted that brother Jerry became annoyed with the victim that evening, and that Jerry shook her. He testified also that Clapp had thrown a can of beer at Betty Malson. Jerry later told Ted that Betty had left town with a man and that she sold her Vega to Sharon. There was also the testimony of Tina and Jeff McFerrin that they had been at the Lindsay home that night to leave, and then to pick up, their daughter who sat with the Lindsay children while the parents attended a movie. Other witnesses testified that witness Clapp had a reputation in the community for violence, and that his reputation for truthfulness was not good. The defense also presented the court file in a criminal case against Clapp which disclosed that— as of November 15, 1983—a charge of theft had been dismissed against Clapp for the ascribed reason that Clapp was "a witness in another case."

The defendant Jerry Lindsay took the stand on his own behalf. He testified that Clapp and Betty were social companions. That night, the Sunday following Thanksgiving of 1982, after Clapp arrived at the Lindsay home, Clapp and Betty left together for about an hour-and-a-half. When the two returned, Tina and Jeff McFerrin visited. They then left for the movies, and that is when Ted arrived at the Lindsay home. Betty and Clapp [so the defendant testified] argued because Betty ran out of beer—and the couple left again. When they returned, Betty appeared to have been crying. Clapp went to the lavatory to inject some substance—possibly cocaine. Betty accused Clapp of beating her—he denied it, and she called him a liar. He struck her in the head with a full can of beer in response, with the threat: "I am going to kill you, you bitch. You called me a liar." Clapp then went into the other room for another injection.

While Ted was still there, Clapp displayed a knife which Ted sharpened for him. Jerry's knife was broken at the time, so Jerry gave it to Ted to take home to fix. Betty carried on at this time with threats to "call the police on Clapp." Ted left and Clapp pacified Betty. Clapp told Betty he would take her to Las Vegas that night, but he had no money, so he asked Lindsay to go bow hunting instead. The three left together, and Clapp asked Lindsay to bring his tow chain along. They stopped for gas on the way and to enable Clapp to "shoot up" a couple of more times. Clapp also made Betty take a number of Valium pills. They continued until they arrived at the cemetery in Appleton City, and stopped on a dark roadway nearby. Clapp then unclothed Betty and wrapped the tow chain around her. Lindsay protested and told Clapp to remove the chain. Clapp feigned that he would, but Lindsay then heard a splash, ran to the back of the truck and saw turbulence. He attempted to rescue Betty, but could not. Clapp refused to help find and retrieve her. Clapp knew that Lindsay was on probation and threatened to tell the police that Lindsay was involved in the murder, should he mention it to anyone. They drove back to Kansas City. The next day, Clapp came by to collect the belongings of the victim. Clapp also pulled up her rug in search for her savings account passbook. Later, Lindsay saw Clapp burn belongings of the victim in his fireplace.

The defendant Lindsay contends that the admission of the Clapp preliminary hearing testimony at the trial of the offense infringed the right of confrontation granted by the federal and state constitutions.

■ The confrontation clause was intended to exclude unreliable hearsay from the conduct of criminal trials. It reflects the constitutional desiderata that accusation be face-to-face and that the accuser be subject to cross-examination at the trial. *Barber v. Page*, 390 U.S. 719 at 721, 88 S.Ct. 1318 at 1320, 20 L.Ed.2d 255 (1968). The right of a defendant to confront and cross-examine a witness against him in a

criminal case, therefore, is essential and fundamental to a fair trial. Denial of that right constitutes a violation of the Sixth Amendment to the United States Constitution made applicable to the states through the Fourteenth Amendment. *Pointer v. State of Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *State v. Murphy*, 592 S.W.2d 727, 731[6, 7] (Mo. banc 1979). In the usual criminal trial, therefore, "the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wished to use against the defendant." *Ohio v. Roberts*, 448 U.S. 56 at 65[4, 5], 100 S.Ct. 2531 at 2538, 65 L.Ed.2d 597 (1980). There is, however, an exception of necessity: where a witness is unavailable and has given testimony at a previous judicial proceeding against the same defendant which was subject to cross-examination. *Barber v. Page*, 390 U.S. at 722, 88 S.Ct. at 1320; *State v. Gray*, 616 S.W.2d 102, 104[1] (Mo.App.1981). To qualify for admission under that exception, the proponent of the evidence must show that the declarant is indeed unavailable and then, that the declaration bears adequate indicia of reliability. *Ohio v. Roberts*, 448 U.S. at 67, 100 S.Ct. at 2540.

The defendant Lindsay argues that the prosecution made no demonstration of due diligence to locate the witness, and hence it was not shown that Clapp was unavailable within the constitutional principle. The defendant argues also that the preliminary hearing was conducted without disclosure by the prosecutor of the extrajudicial statements given by Clapp to the police, and hence cross-examination at the preliminary hearing was impaired and the fact-finding process lacked the integrity the confrontation clause protects.

■ The court allowed the jury to receive the prior extrajudicial statements given by Clapp to the police, without limitation as evidence. The defendant argues, nevertheless, that the mere recital of those contents at the trial did not cure the want of cross-examination because the jury was denied opportunity to observe the demeanor of witness Clapp, and hence—we assume—

the integrity of their fact-finding was impaired. The right to confront a witness encompasses both opportunity for a defendant to cross-examine, and for the jury to observe, the witness. The opportunity to cross-examine is indispensible to the exercise of the right, while the opportunity for the jury to observe the witness is an interest which gives way to considerations of necessity—as where the witness is unavailable. *Phillips v. Wyrick*, 558 F.2d 489, 495[15] (8th Cir.1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1283, 55 L.Ed.2d 793 (1978); *State v. Ivicsics*, 604 S.W.2d 773, 779 (Mo.App.1980). The issues before us, rather, are whether the defendant was afforded the right to cross-examine witness Clapp as to the testimony received at the trial, and whether Clapp was, in fact, unavailable as a witness.

■ There is intimation that the *opportunity* to cross-examine at the preliminary hearing, *simpliciter*, satisfies the confrontation principle. *California v. Green*, 399 U.S. 149, 166, 90 S.Ct. 1930, 1939, 26 L.Ed.2d 489 (1970); *Ohio v. Roberts*, 448 U.S. at 69, 100 S.Ct. at 2540. There is no question, however, that previous preliminary hearing testimony, cross-examined, like previous trial testimony, cross-examined, is "deemed generally immune from subsequent confrontation attack." *Ohio v. Roberts*, 448 U.S. at 72–73, 100 S.Ct. at 2542. That is because the accouterments of the preliminary hearing, no less than that of a trial, engender a trustworthiness and validity of the fact-finding function: a proceeding before a judicial tribunal, a witness under oath, a judicial record of the hearing, a defendant represented by counsel, opportunity by counsel to cross-examine, and actual cross-examination of the witness. *Ohio v. Roberts*, 448 U.S. at 69, 100 S.Ct. at 2540. Our decisions are in accord. *State v. Holt*, 592 S.W.2d 759, 766 (Mo. banc 1980); *State v. Murphy*, 592 S.W.2d 727, 731 (Mo. banc 1979); *State v. Ivicsics*, 604 S.W.2d 773, 779 (Mo.App. 1980); *State v. Hicks*, 591 S.W.2d 184, 186–87 (Mo.App.1979). In this case, the preliminary hearing was conducted before a duly

constituted judicial tribunal [the Associate Circuit Judge of St. Clair County], the witness [Clapp] was under oath, the defendant Lindsay was represented by counsel, counsel cross-examined Clapp at length [some sixty transcript pages] and to effect [the varied prior criminal activity of the witness and other facets of credibility were thoroughly explored], and the proceedings were collected in a judicial record. The right of the defendant Lindsay to confront the witness Clapp was not infringed for want of cross-examination.

The validity of the preliminary hearing testimony as evidence at the trial, therefore, rests on whether Clapp was in fact *unavailable* as a witness in the constitutional sense. " '[A] witness is not "unavailable" for purposes of the ... exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.' " *Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543; *Barber v. Page*, 390 U.S. 724–25, 88 S.Ct. at 1322. The burden to prove good faith falls on the prosecution, and "the lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." *Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543, *quoting California v. Green*, 399 U.S. at 189, n. 22, 90 S.Ct. at 1951, n. 22. The question, then, reduces to whether the prosecution exercised reasonable diligence to ensure the presence of Clapp as a witness at the trial. *State v. Denmon*, 635 S.W.2d 345, 348[3, 4] (Mo.1982). The reasonableness of the effort necessarily depends upon the circumstances shown in the particular case. *State v. Murphy*, 592 S.W.2d at 731[6, 7].

The trial against the defendant Lindsay commenced in the circuit court of Henry County [on change of venue from St. Clair County] on April 23, 1984. The next day, the prosecution announced to the court the intention to tender as evidence the preliminary hearing testimony of Charles Clapp on the ground that the witness was unavailable. The proof on that tender was through the testimony of attorney Alex Peebles and was otherwise intersticed by other testimony and acknowledgments of certain facts by counsel.

The preliminary hearing on the complaint against Lindsay was conducted before the Associate Circuit Judge of St. Clair County on November 29, 1983. The witness Clapp by that time had already given the police three statements concerning the events on November 26, 1982, the date of the Betty Malson homicide. Clapp had also given his deposition testimony on November 9, 1982. Clapp, himself, was at that time under criminal charge, and was represented by Attorney Peebles. There was some concern expressed on the occasion of the deposition on November 9, 1983, for the continued safety of Charles Clapp and "as to who knew where he was going to be." Attorney Peebles discussed with St. Clair County Prosecutor Ash "an arrangement for keeping tab on Mr. Clapp" and to "provide him for the State" on request. Mr. Peebles acceded, and in his terminology, "I took it upon myself to inform the prosecutor that I would see that Mr. Clapp came to court from time to time as needed. I presumed that because I felt it was my duty." Clapp appeared at the preliminary hearing seventeen days later under those auspices, and appeared again to sign his deposition the next month in December—although the transcript was not yet ready and the signature was never affixed. That was the last time Attorney Peebles saw Clapp. He had arranged for Clapp to telephone him every Sunday to inform Peebles where he then lived, and for several weeks either Clapp or his wife telephoned as arranged. At the time the deposition was given, on November 9, 1983, the Clapps lived at 8102 [or 8201] East 100 Terrace in Kansas City, Missouri. At the time of the last of the periodic telephone calls to Peebles, they reported as the personal address, "the Interstate Motel on I–70, out near Blue Springs." The wife informed Peebles that "she had the kids in school there and everything was fine," so Peebles assumed that Clapp would be available at that location.

Thus, the last time Peebles saw Clapp was in December of 1983, when Clapp ap-

peared to give the deposition his signature. The last time Peebles talked to Clapp or his wife to confirm a present location by telephone was about five months prior to April 23, 1984, the date of the Lindsay trial. Peebles represented Mrs. Clapp in a civil matter, and conferred with her in his office on about February 23, 1984—two months before the Lindsay trial. On that occasion, Peebles informed her that the case was set [April] "the 23rd," and instructed: "Now, make sure that you have Clapp there and you make sure you let me know beforehand, two or three days, so I can tell Mike [Prosecutor Ash]." Peebles "never thought to ask her if she had moved from the Interstate." Prosecutor Ash telephoned Peebles "a time or two after that to make sure I [Peebles] knew where Clapp was." That caused Peebles some uneasiness, and he telephoned the motel near Blue Springs—the last address for the Clapps known to Peebles—and was informed that they had moved. Peebles thereupon addressed a letter to Clapp at the Interstate Inn on I-70 near Blue Springs with the expectation that the letter would be forwarded, but it was not delivered.[2]

Peebles then got in touch with LaPage, an investigator in the office of the Jackson County Prosecutor, to help find Clapp. Peebles suggested that LaPage inquire of the school board as to the address of the Clapp children [actually of the wife from a prior marriage], but Peebles never heard back. LaPage did inform Peebles that Clapp's mother lived at 8801 Indiana. Peebles wrote her to urge that if she knew where Clapp was, to "make sure ... one or the other of them call me." Peebles never heard from either Mr. or Mrs. Clapp, nor

from the mother, nor was the letter returned.

On March 30, 1984, Prosecutor Ash directed a subpoena to issue to Clapp for service upon him at the Interstate Inn, *Belton*, Missouri. [The proper last known address, of course, was the Interstate Inn in *Blue Springs*, Missouri.] The subpoena was returned on April 10, 1984, with the legend: "There is no place in this county with this name." In the interim between the requisition for the subpoena on March 30, 1984 and the return *non est* on April 10, 1984, Peebles had talked with Prosecutor Ash to inform him that Clapp had left the Interstate Inn—and that Peebles could not find him. Thus, had process been directed to the proper last known address, it could not have been effective in any event.

In the course of defense rebuttal of the prosecutorial proof of due diligence, and hence the unavailability of Clapp and the admissibility of the preliminary hearing testimony, counsel presented to the court as fact that in a recent judicial proceeding in Jackson County by Janelle Clapp [a former wife] for unpaid child support against Clapp, over a span of recent and contemporaneous time:

"[T]here have been about five or six show cause orders issued to Charles Clapp ... All of them have been returned non est ... All of them have been issued during the period that he was living in Jackson County, Missouri, and living at 8201 East 100 Terrace, I believe was the address. *They were listed to that address and every other address that he has had.* [emphasis added]

There was yet other evidence from the defense through Terry Burgess, former husband of the present Mrs. Clapp [and father of the child, concerning whom Pee-

---

**2.** In his argument to the court in opposition to the admission of the Clapp preliminary hearing testimony defense counsel Purdy asserted as fact that the Clapps removed from the Interstate Inn "February 23rd, 1984, in the middle of the night carrying away everything that was loose laying around the motel room, having told the babysitter that they were going away, that was all." That departure, the Purdy assertion intimated, was all the more abrupt since when they

left, "three to five days' rent" remained prepaid. The sudden departure by the Clapps on February 23, 1984, coincides with the information imparted by Peebles to Mrs. Clapp in his office on about that very day that the date for the Lindsay trial had been set for April 23, 1984— two months hence—and allows the inference that the Clapp departure was prompted by the design to evade process to compel his attendance as a witness at that proceeding.

bles suggested LaPage make inquiry at the school board to locate Clapp] that then, at the time of trial, his former wife and the child—and hence Clapp—were "probably between Texas and Las Vegas." The child, Burgess testified, was "pulled out [of school] *at the end of February* and they have not received no transfer forms yet." [emphasis added]

The propriety of the trial court decision to allow the Clapp preliminary hearing transcript testimony as evidence at the trial depends, therefore, upon whether the prosecutorial authority made a diligent, that is a good faith, effort to obtain his presence at the trial. *Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543. In the case where the location of the witness is known and is amenable to process, due diligence and good faith require that the prosecutor use the power of process available under the law to bring the person of the witness before the court. *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *State v. Gray*, 616 S.W.2d 102 (Mo.App. 1981); *State v. Kain*, 330 S.W.2d 842 (Mo. 1960). In the case where the location of the witness is not known, good faith requires the prosecutor to undertake all *reasonable* initiatives to produce the witness. *California v. Green*, 399 U.S. 149, 189, n. 22, 90 S.Ct. 1930, 1951, n. 22, 26 L.Ed.2d 489 (1970); *Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543; *State v. Murphy*, 592 S.W.2d at 731[6, 7].

The full circumstances before the trial court on the hearing to determine the unavailability of the witness Clapp, and so to qualify the preliminary hearing testimony as evidence at the trial as an exception to the confrontation principle, not only demonstrate that the location of the person Clapp was not known, but even that Clapp could not be found by any reasonable effort of the prosecutor. The deposition of witness Clapp was taken by the prosecutor in advance of the preliminary hearing. There was concern expressed then as to the safety of the witness and "as to who knew where he was going to be." Peebles, personal attorney of the Clapp family, offered to "keep tab on Mr. Clapp" and to "provide him to the State" on request. Peebles thereafter produced Clapp for the preliminary hearing on November 29, 1983, and thereafter produced Clapp again to give his signature to the deposition. Clapp—through his wife—kept Peebles informed of their present location by regular and periodic telephone calls. The last personal address reported was at the Interstate Motel in Blue Springs, Missouri. Then, on about February 23, 1983, Peebles saw Ms. Clapp in his office and informed her that the trial of the case was scheduled on April 23rd—some two months hence. Peebles did not inquire—but assumed correctly—that the Clapps still lived there. Soon thereafter, he telephoned the motel, but was informed that the Clapps had moved. It is an evident inference from the facts presented to the court on the tender of the Clapp preliminary hearing testimony that the Clapps, as soon as they learned from Peebles that the trial date was imminent, abruptly left the Interstate lodgings [with prepaid room rent still unused], removed the [Burgess] child from the school enrollment, and fled.

██ It is so that the subpoena issued by prosecutor Ash on March 30, 1984 was misdirected to the Interstate Inn in *Belton*, rather than in *Blue Springs*. Had that process issued to the correct address as last known, however, it would have been to no avail, since by then the Clapps were gone. It is also so that prosecutor Ash made no further attempt to serve the witness Clapp, but by that time the witness was beyond reasonable effort to locate. Attempts to serve him with process were made repeatedly in an unrelated civil case—five or six times—directed to the home address on East 100th Terrace "and every other address that he has had." All were returned *non est*. There would have been no purpose to attempt inquiry at the school for the location of the child, since the child had been withdrawn and had not yet been registered elsewhere. The defendant argues also that the prosecutor made no attempt to reach the parents or siblings of Mrs. Clapp. From the circum-

stances known to the prosecutor, however, there was reason to believe, from his abrupt departure, that Clapp was in flight to avoid process and obligation to testify— and that the family [whoever they may have been] would have been of no aid to the prosecutor. "The lengths to which the prosecution must go to produce a witness is a question of reasonableness." "The law does not require the doing of a futile act." *Ohio v. Roberts*, 448 U.S. at 74, 100 S.Ct. at 2543.

In *State v. Ivicsics*, 604 S.W.2d 773 (Mo. App.1980), an attempt at service of process accompanied by inquiries at the presence of the witness in an area other than the usual place of residence, was an exercise of due diligence and constituted a good faith effort to secure the attendance of the witness at the trial. In *State v. Murphy*, 592 S.W.2d 727 (Mo. banc 1979) two witnesses had given their testimony at the prior trial, and shortly before the retrial, the prosecutor caused subpoenas to issue, but they were returned *non est*. Then the prosecutor attempted to locate them by an investigator and learned they were somewhere outside the state. The court noted that the two had been around the jurisdiction for several years and the prosecutor "had no reason to anticipate difficulty in recalling them for a second trial." *Id.* at 731. Those facts, the court concluded, proved reasonable diligence and good faith effort to produce the witness, and so allowed the transcript of the previous trial as the evidence of their testimony. In this case, also, the prosecutor had no reason to anticipate that Clapp would flee—when he did— and so place himself beyond recall as a witness. Clapp appeared faithfully for the preliminary hearing, for the signature to his deposition, and then reported periodically to attorney Peebles. Peebles, and the prosecution through him, was reassured of the continued availability of the witness until about February 23rd, when the Clapps learned of the impending trial and took flight. After that date, there was no clue as to where Clapp might be found with reasonable effort. In those circumstances, the conduct of the prosecutor was diligent and Clapp was *unavailable* as a witness.

The defendant argues, however, that the reliance by the prosecutor upon Peebles to produce the witness does not constitute due diligence nor excuse the prosecutor from his duty. The arrangement between them, however, was not for the purpose of the production of a witness, but merely for the location of the witness. The means of production was by authority of the subpoena, an authority exercised by the prosecutor. A prosecutor does not fail in diligence by confiding in the witness the responsibility to notify the prosecutor upon a change of address. In *State v. Denmon*, 635 S.W.2d 345 (Mo.1982), the prosecutor instructed the witness to call immediately of a change of address or of a move. The court determined that such an arrangement neither compromised the good faith nor the diligence of the duty of a prosecutor to produce a witness, but rested on a reasonable basis. "[T]here was no reason to believe that Simmons would not inform of any change of address because he had been cooperative up to and including that time." *Id.* at 349. The witness could not be found and the subpoena was left with his mother. She reported to them simply that he had telephoned that he was going to Denver, Colorado. The court determined the witness was not available, and allowed the prior testimony. Here, the arrangement was more secure—if for no other reason than that the witness was not left to his own supervision. The confidence of the prosecutor in the superintendence of lawyer Peebles, moreover, was reasonable, since he had ensured the Clapp presence at the deposition. Peebles was also the personal attorney for the family so that his continued knowledge of the Clapp location was reasonably expected. The prosecutor did not fail his duty of diligence or good faith on that account. In the full circumstances, witness Clapp was unavailable as a witness, and his testimony transcribed at the preliminary hearing was admissible at the trial.

The defendant contends also that the court erred in the denial of a mistrial. The defendant Lindsay took the stand to testify. In cross-examination, the prosecutor asked:

And now, this is the first time you've told anyone other than your attorney about what happened that night?

The defendant objected, and the court sustained objection. The defendant then moved for a mistrial. The court denied the motion but instructed the jury:

The jury will disregard the last question and the answer if it was answered.

There was no answer to the question.

The defendant argues that the question was an allusion to his post-arrest silence, and therefore interdicted. The prosecution contends that the inquiry was directed to the *pre-arrest* failure of the defendant Lindsay to report the murder by Clapp—as his version of the events had it. The prosecution argues that the question was within the legitimate scope of cross-examination, and that, in any event, the pre-arrest silence of the defendant does not limit inquiry where the defendant made statements to the police after administration of the Miranda warnings.

The question posed to the defendant on cross-examination was broad and ambiguous. The court understood the inquiry as a probe into the post-arrest silence of the defendant Lindsay, rather than to the pre-arrest failure to inform the police that Clapp murdered Betty Malson. Lindsay, however, did not exercise any right to post-arrest silence, but gave a statement to the police after arrest and after warnings. The narratives to the police acknowledged that he knew the victim Betty Malson, accompanied Clapp [whom he accused of the crime] and the victim in the truck to the pit strip, and that a log chain was tied around her neck—among other incidents of the events that day.

The theory of the rule against evidence of post-arrest silence [with the concomitant inference of a failure to volunteer an exculpatory statement] is that it penalizes a defendant for the exercise of the right to remain silent. That rationale, however, has no application where—as here—the defendant, after advisement of rights, made a statement to the police of the criminal event. *State v. Van Doren,* 657 S.W.2d 708, 716[14, 15] (Mo.App.1983); *State v. Trice,* 575 S.W.2d 739, 742[8, 9] (Mo.App. 1978).

The question, although proper cross-examination, went unanswered. Thus, there was no prejudice to the defendant in any event. *State v. Harris,* 547 S.W.2d 473, 475[2] (Mo. banc 1977); *State v. Outley,* 693 S.W.2d 184, 187[3, 4] (Mo. App.1985).

The judgment is affirmed.

All concur.