STATE of Missouri,
Plaintiff–Respondent,

v.

Daniel L. IVICSICS,
Defendant–Appellant.

No. 40599.

Missouri Court of Appeals,
Eastern District,
Division Four.

Aug. 26, 1980.

**775**

James G. Gregory, Montgomery City, for defendant–appellant.

John Ashcroft, Atty. Gen., by Steven D. Steinhilber, Asst. Atty. Gen., Jefferson City, for plaintiff–respondent.

SATZ, Judge.

Defendant, Daniel Ivicsics, stabbed his brother, Robert Ivicsics. Robert subsequently died. A jury found defendant guilty of manslaughter, and he was sentenced to eight years imprisonment. Defendant raises 8 points on appeal. Finding one to have merit, we reverse and remand for a new trial and address those other issues which may arise on retrial.

Prior to the stabbing, defendant and his brother Robert were not on friendly terms. Robert had threatened to kill defendant and, just prior to the stabbing, he had threatened to shoot defendant. On the evening of September 19, 1977, defendant and Robert began arguing and fighting inside defendant's trailer. Defendant ordered Robert to leave the trailer and, when Robert refused to do so, a Michael Atwood, who was also at the scene, forcibly pushed Robert out of the trailer. What then ensued is the subject of dispute.

According to the state's evidence, Robert then ran to his car, reached under the seat of the car and turned to go back to the trailer. Defendant ran from the trailer toward Robert and the two met about 10 to 15 feet from the trailer. Robert "swung at", "grabbed" or "reached out for" defendant and defendant stabbed Robert with a bayonet in the abdomen.

According to defendant, after Robert was pushed out of the doorway of the trailer, defendant went to his room in the trailer and got out his old army bayonet. Defendant went to the doorway of the trailer. Robert was attempting to force his way back into the trailer through the doorway. Defendant thought Robert had a gun. Fearing for his life, defendant stabbed Robert "at the front door of the trailer", and Robert staggered back into the street and fell.

There is no dispute that, after the stabbing, defendant left in his car. Nor is there any dispute that Robert was taken to a

hospital in Mexico, Missouri for treatment of an abdominal stab wound and that he was later transferred to another hospital for further treatment. Septicemia, a bacterial infection of the blood, developed at the site of Robert's wound and he died on October 6, 1977. According to the doctor who performed the autopsy, Robert died of "septicemia, following an abdominal stab wound".

The trial court gave an instruction on self defense and did not give an instruction on defense of habitation. Defendant contends the failure to give an instruction on defense of habitation was prejudicial error. We agree.

If supported by the evidence, a trial court must submit an instruction on justifiable homicide, whether or not requested to do so. Rule 26.02; *State v. Austin*, 367 S.W.2d 485, 486 (Mo.1963); MAI–CR 2.40. In the instant case, the instruction given by the trial court informed the jury that defendant was justified in killing Robert if he did so in self defense. However, a homicide may also be justified as a defense of habitation and, if the evidence supports this defense, an instruction must be given on the defense of habitation either along with or rather than an instruction on self defense. *State v. Kizer*, 230 S.W.2d 690, 691 (Mo.1950); *State v. Shiles*, 188 S.W.2d 7, 9 (Mo.1945).

Self defense, as its name implies, defines a defender's privilege to defend himself against a personal attack. Defense of habitation, as its name implies, defines a defender's privilege to defend his dwelling against an unlawful entry. The two defenses are separate and distinct. However, in Missouri, they closely track one another, and, when, as here, there is evidence that an entry is being made for the purpose of attacking the defender, the question arises whether the distinction between the two defenses still remains; and, more specifically, whether an instruction submitting self defense adequately submits the defense of habitation.

In the instant case, we are concerned with the use of deadly force. Self defense grants a defender the privilege to use deadly force in the effort to defend himself against personal harm threatened by the unlawful act of another, if the defender has reasonable cause to believe that (1) there is immediate danger the threatened harm will occur, (2) the harm threatened is death or serious bodily injury and (3) deadly force is necessary to overcome the harm as reasonably perceived. *State v. Sanders*, 556 S.W.2d 75, 76 (Mo.App.1977); *State v. Jackson*, 522 S.W.2d 317, 319 (Mo. App.1975). In addition, to invoke this privilege, the defender must "have done everything in his power, consistent with his own safety, to avoid the danger . . ., and he must retreat, if retreat is practicable", before responding to the threatened harm with deadly force. *State v. Sherrill*, 496 S.W.2d 321, 325–326 (Mo.App.1973). Self defense does not grant the defender the privilege to use deadly force against an obviously nondeadly attack. *State v. Brown*, 502 S.W.2d 295, 299 (Mo.1973); *State v. Stubenrouch*, 591 S.W.2d 42, 46 (Mo.App.1979).

Similarly, defense of habitation grants a defender the privilege to use force to defend his dwelling against an unlawful entry. *E. g. State v. Brookshire*, 353 S.W.2d 681, 690 (Mo.1962). There are still strong societal reasons for recognizing the dwelling as a place of refuge in which the occupant may expect to be free from personal attack even of a non–deadly character, and, thus, forceful argument is still made that an unlawful entry of a dwelling for the purpose of an assault may be resisted by deadly force if this reasonably seems necessary, even though the circumstances do not justify the belief there was actual danger of death or serious bodily harm. *Leverette v. State*, 122 S.E.2d 745, 746–747 (Ga.App.1961); *People v. Eatman*, 405 Ill. 491, 91 N.E.2d 387, 389–390 (Ill.1950). Under this reasoning, defense of habitation differs from self defense by authorizing the use of deadly force against a non–deadly personal attack. Apparently, in Missouri, we do not accept this argument and distinc-

tion. In dicta and by clear implication, our courts have consistently refused to extend the privilege of using deadly force to prevent an entry attempted for the mere purpose of making a personal assault which is neither intended nor likely to kill or to inflict serious bodily harm. *See State v. Hargraves*, 188 Mo. 337, 87 S.W. 491, 495 (1905); *State v. Taylor*, 143 Mo. 150, 44 S.W. 785, 789 (1898); *see also, State v. Brookshire, supra* at 691–692. Thus, our Supreme Court explicitly defined the defense of habitation as follows:

> " 'When an assault on a dwelling and an attempted forcible entry are made under such circumstances as to create a reasonable apprehension that it is the design of the assailant to commit a felony or to inflict on the inmates a personal injury which may result in the loss of life or great bodily harm, the danger that the design will be carried into execution being imminent and present, the lawful occupant of the dwelling may lawfully *prevent the entry*, even by the taking of the life of the intruder.' (Italics added.) Vol. I, *Wharton, Criminal Law and Procedure*, § 220." *State v. Brookshire, supra* at 691.

This approved definition indicates the amount of force privileged by the defense of habitation is no different than the amount of force privileged by self defense. Moreover, the Court noted the two defenses differ in only two respects. Defense of habitation differs from self defense by exempting the occupant from the duty to retreat, if feasible before using deadly force, *State v. Brookshire, supra* at 690, *State v. Lawrence*, 569 S.W.2d 263, 265 (Mo. App.1978). It also differs from self defense by authorizing "protective acts to be taken earlier than they otherwise would be authorized, that is, at the time when and place where the intruder is seeking to cross the protective barrier of the house". *State v. Brookshire, supra* at 692. Once the intruder has entered the house without resistance, the usual principles of self defense apply, except there is no duty to retreat. *State v. Brookshire, supra* at 692. In short, in Missouri, defense of habitation is nothing more

than accelerated self defense, and the difference between the two defenses is a function of time and space.

To focus on this difference when a personal attack is in issue, we paraphrase our courts' definition and concept of defense of habitation in language which tracks the definition of self defense. The defense of habitation grants the lawful occupant of a dwelling the privilege to use deadly force to prevent an attempted unlawful entry into the dwelling, if the occupant had reasonable cause to believe that (1) there is immediate danger the entry will occur, (2) the entry is being attempted for the purpose of killing or inflicting serious bodily harm on the occupant and (3) deadly force is necessary to prevent the unlawful entry. This paraphrase makes the similarity between defense of habitation and self defense obvious when a personal attack is in issue. It also emphasizes the crucial difference between the two defenses. In self defense, the defender must have reasonable cause to believe the danger of harm from personal attack is immediate before he is justified in responding to the attack. In defense of habitation, the defender need not wait until the danger of harm is immediate; rather, he may respond when he has reason to believe there is immediate danger the unlawful entry will occur. The significance of this difference is apparent when the defender is a great distance from a closed doorway which an intruder, bent on violence, is attempting to enter. Under those facts, a jury could sensibly find the defender was justified in using deadly force in preventing the entry because the defender has reasonable cause to believe there was immediate danger the entry would occur, but, because of the defender's distance from the doorway and the time needed to cross the distance, the jury could not with equal sense find the defender had reasonable cause to believe he was in immediate danger of personal harm. Arguably, as the distance between the defender and the doorway is lessened and as the time needed to cross this distance is thereby lessened, the difference between defense of habita-

tion and self defense is lessened, and, at some point, perhaps when the defender is immediately adjacent to the doorway, defense of habitation and self defense merge and become the same defense. At this point, an instruction on either defense may suffice. However, the determination of the point in time and space that the two defenses merge is an abstract and theoretical determination. The trial court should not be required to make and should not make this determination. As long as the evidence shows the intruder has not entered the dwelling, an instruction defining the defense of habitation must be given so the jury can focus on the immediacy of the danger of the entry rather than on the immediacy of the danger of the harm.

The instruction here in question directed the jury to acquit the defendant if they found that he "had reasonable cause to believe and did believe that he was in immediate danger of death or serious bodily harm and had reasonable cause to believe and did believe that it was necessary for him to act as he did to protect himself from such danger". This instruction, a self–defense instruction, was supported by the state's evidence but not by defendant's evidence. Defendant's evidence required a defense of habitation instruction. Under defendant's evidence, a proper instruction would direct the jury to acquit the defendant if he had reasonable cause to believe and did believe there was immediate danger that an unlawful entry would be accomplished or effected for the purpose of inflicting death or serious bodily harm and he had reasonable cause to believe and did believe that it was necessary for him to act as he did to prevent the unlawful entry.

■ The state contends there was not sufficient evidence to support a defense of habitation. According to the state, the scenario painted by defendant's testimony is one of a continuous struggle taking place *after* Robert had already entered the trail-

er. We do not agree. Defendant testified that he stabbed Robert while Robert was trying to force his way back into defendant's trailer. Defendant also stated he stabbed Robert while in fear for his own life and under the belief that Robert had a gun. The state's evidence showed that, after previously being evicted from defendant's trailer, Robert had run to his car, reached under the car seat for "something" before attempting to force his way back into the trailer. In addition, Robert owned a pistol and had recently threatened to shoot defendant. Thus, there was sufficient evidence to support the defense of habitation, and it was reversible error not to submit this defense to the jury by a proper instruction. *State v. Kizer, supra; State v. Shiles, supra.*

We now address the remaining issues raised by defendant which may come up again on retrial. Michael Atwood, the young man who pushed Robert Ivicsics out the trailer door, did not appear at trial. However, he had testified at the preliminary hearing and, at trial, over defendant's objection, the state read the record of his preliminary hearing testimony into evidence. Defendant contends this admission of Atwood's prior recorded testimony was prejudicial error. More specifically, defendant argues he was denied his right to confrontation guaranteed by the Sixth and Fourteenth Amendments of the U.S. Constitution because (1) the state failed to show a good faith effort to secure Atwood's presence at trial and, therefore, Atwood was not an unavailable witness, (2) the cross–examination at a preliminary hearing is not an adequate substitute for the right to confrontation and (3) without Atwood being present at trial, the jury could not observe his demeanor and, therefore, could not properly evaluate his credibility.[1]

■ Defendant's Sixth Amendment right to confront a witness is applicable to

---

1. Defendant also argues he was denied his right to confrontation because the state failed to make a showing of any compliance with former Rule 25.43 (present Rule 25.14). This rule establishes the procedures which must be com-

plied with when taking a deposition. The rule is clearly inapplicable to a determination of the admissibility of testimony given at a preliminary hearing.

all criminal proceedings in state courts under the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965). However, an exception to this right "exists where a witness is unavailable and has given testimony which was subject to cross–examination at previous judicial proceedings against the same defendant". *State v. Holt*, 592 S.W.2d 759, 765 (Mo. banc 1980). For our purposes here, a witness is unavailable if he cannot be found. *State v. Purl*, 183 S.W.2d 903, 904 (Mo.1944). To establish unavailability on this ground, the state must show an exercise of due diligence and a good faith effort to secure the attendance of the witness at trial. *State v. Murphy*, 592 S.W.2d 727, 731 (Mo. banc 1979); *State v. Purl, supra.* What constitutes due diligence depends on the facts of the particular case. *State v. Murphy, supra.* In the instant case, the sheriff unsuccessfully attempted to serve a subpoena on Atwood and also made inquiries concerning Atwood's presence in the St. Louis area, a jurisdiction away from his usual place of residence. Although marginal, this was an adequate showing of due diligence to secure Atwood's attendance at trial. *See State v. Murphy, supra; Compare, State v. Dreiling*, 601 S.W.2d 660 (Mo.App.So.Dist.1980). On retrial, we assume the state will make an additional effort to secure Atwood's attendance, and, if Atwood fails to appear, we assume the state will make a detailed and explicit showing of its additional effort to secure his attendance.

Defendant next contends that the cross–examination at a preliminary hearing is not an adequate substitute for his right to confrontation. Defendant argues that it is "good trial strategy" to refrain from questioning an adverse witness in detail at a preliminary hearing. He might also have noted the recognized constraints placed upon cross–examination by the time and

purpose of a preliminary hearing.[2] However, regardless of the possible deficiencies of cross–examination at a preliminary hearing, defendant has not demonstrated these deficiencies did in fact exist in the instant case, and, more important, under the mandate of our Supreme Court, defendant's right to confront Atwood at trial was satisfied simply by defendant exercising the right to cross–examine Atwood at the preliminary hearing. *State v. Holt, supra.*

Defendant finally argues the right °to confront a witness is meaningless if the jury cannot observe the demeanor of the witness. We disagree. Although the right to confront a witness encompasses both the opportunity for a defendant to cross–examine the witness and for the jury to observe the witness, the former is an essential element while the latter is only an incidental advantage which must, at times, give way to the necessities of a particular case. *Phillips v. Wyrick*, 558 F.2d 489, 495 (8th Cir. 1977). On the present record, the trial court properly admitted the transcript of Atwood's preliminary hearing testimony into evidence.

■ Defendant next contends the trial court erred in prohibiting him from introducing an extra–judicial statement made by Atwood to a Michael Ivicsics. At trial, defendant called Michael Ivicsics and sought to elicit a statement allegedly made by Atwood to Ivicsics that Atwood had taken a gun off of "Robert's person" on the night of the stabbing. The state objected to the statement as hearsay. When told this statement allegedly was made after Atwood's testimony at the preliminary hearing, the court sustained the state's objection. Clearly, the statement is hearsay. The only viable question on retrial would be whether the statement falls within an exception to the hearsay rule.

---

**2.** "The preliminary [hearing] is usually held within a short time after the apprehension of the accused and often without opportunity for a full preparation upon the merits. The inquiry is directed to ascertaining whether or not a felony has been committed and whether or not there is probable cause to believe the accused

guilty thereof. It does not contemplate the establishment or refutation of the guilt of the accused beyond a reasonable doubt as is the ultimate fact issue at the trial on the merits, and for which counsel has had ample opportunity to prepare." *State v. Lloyd*, 337 Mo. 990, 87 S.W.2d 418, 421 (1935).

Defendant argues the statement qualifies as an exception to the hearsay rule because it is a declaration against penal interest. Defendant fails to explain why the statement should be so characterized. Moreover, our courts still refuse to recognize this hearsay exception in criminal cases. *E. g., State v. Brown*, 404 S.W.2d 179, 185 (Mo.1966); *State v. Grant*, 560 S.W.2d 39, 42 (Mo.App.1977).

Defendant also argues that the proffered statement was admissible as impeachment of Atwood's preliminary hearing testimony. Defendant failed to show the trial court and fails to show on appeal any inconsistency between Atwood's alleged statement to Ivicsics and Atwood's preliminary hearing testimony. Without this threshold showing of inconsistency, it is questionable whether Atwood's alleged statement can be used for impeachment. *See State v. Nimrod*, 484 S.W.2d 475, 478 (Mo.1972). However, if the inconsistency is demonstrated on retrial, we believe Atwood's alleged statement is admissible even though made subsequent to his preliminary hearing testimony.

A witness may be impeached by a statement he made prior to trial which is inconsistent with his testimony at trial. A proper foundation must first be laid by asking the witness, among other questions, if he made the prior statement, and obtaining either a denial or an answer that he failed to remember it.[3] *State v. Graves*, 588 S.W.2d 495, 498 (Mo. banc 1979); *State v. Vaughn*, 501 S.W.2d 839, 842 (Mo. banc 1973). This rule requiring the laying of a foundation is a rule of fairness. It is designed to prevent surprise to the party offering the witness, to present a complete picture of the witness' credibility by allowing him, in fairness, to explain any inconsistency and to avoid false testimony being manufactured by the impeacher. *Aboussie v. McBroom*, 421 S.W.2d 805, 807 (Mo.App. 1967); *see also State v. Devorss*, 221 Mo.

469, 120 S.W. 75, 77 (1909). However, the rule may work unfairly against the impeacher. Thus, in the instant case, Atwood's unavailability makes his preliminary hearing testimony admissible at trial; but, at the same time, his unavailability prevents the laying of a foundation for impeaching this testimony. The state gets the best and defendant (impeacher) gets the worst of both possible worlds. The scales should be balanced. Since Atwood's unavailability makes his preliminary hearing testimony admissible at trial, his unavailability should make his statements impeaching this testimony admissible without a foundation.

This balancing spreads the procedural unfairness equally between the state and the defendant. The state takes advantage of the unavailability of the witness in order to use his prior recorded testimony at trial. The state should also bear the burden of possible surprise caused by his unavailability. *People v. Collup*, 27 Cal.2d 829, 167 P.2d 714, 718 (1946). Moreover, if the witness' impeaching statement is to be subject to the suspicion of perjury, *Mattox v. United States*, 156 U.S. 237, 250, 15 S.Ct. 337, 342, 39 L.Ed. 409 (1895), the state may likewise be suspected of directing the witness to leave the jurisdiction because it believed his prior testimony would be impeached. More important, the balancing of possible unfairness is followed in analogous fact situations. Thus, contradictory statements may be used at trial to impeach a dying declaration, *see State v. Cole*, 547 S.W.2d 494, 496–497 (Mo.App.1977) and to impeach the attestation of an unavailable attesting witness, *German Evangelical B. Church of Concordia v. Reith*, 327 Mo. 1098, 39 S.W.2d 1057, 1064–1065 (Mo. banc 1931), even though no foundation can be laid. The apparent basis for this rule is that the impeaching party never had the opportunity to cross–examine the declarant or attesting witness and, therefore, the impeaching

---

**3.** Normally, a proper foundation also requires the impeacher to call the witness' attention to the person to whom the prior statement was made and to the time, place and circumstances of the prior statement. *State v. Graves, supra* at 498–499; *State v. Bennett*, 87 S.W.2d 159, 162 (Mo.1935).

party was unable to test the reliability and credibility of the declarant or attesting witness. *Carver v. United States,* 164 U.S. 694, 697–698, 17 S.Ct. 228, 229–230, 41 L.Ed. 602 (1897). Since necessity compels the admission of an attestation and a dying declaration untested by cross–examination, necessity compels the admission of statements contradicting the dying declaration or attestation without a foundation. *Carver v. United States, supra; compare Mattox v. United States, supra* 156 U.S. at 250, 15 S.Ct. at 342. While defendant, in the instant case, did have the opportunity to cross–examine Atwood at the preliminary hearing, that cross–examination obviously could not serve to test the credibility of any statements made by Atwood subsequent to the hearing. As far as statements made subsequent to the preliminary hearing are concerned, defendant is no better off having been able to cross–examine Atwood at the preliminary hearing, than he would be had he been unable to do so. Finally, under the present fact situation, we believe less injustice is worked by eliminating the required foundation and running the possible risk of manufactured evidence than by rigidly insisting the foundation be laid and, thus, preventing a full disclosure of all relevant facts. *See People v. Collup, supra; see also State v. Earley,* 49 Ohio App.2d 377, 361 N.E.2d 254, 258–259 (1975).

■ Defendant next contends the trial court erred in rejecting his evidence that Robert committed specific acts of violence upon members of defendant's family. This evidence, defendant argues, was relevant and, therefore, admissible because it showed the reasonableness of defendant's fear of Robert and, also, showed Robert to be the aggressor. We disagree. Evidence of Robert's reputation for violence would be admissible to support defendant's defense of habitation theory, but such evidence must be proved by testimony concerning

general reputation and not, as defendant urges, by specific acts of violence which are not connected with defendant. *State v. Duncan,* 467 S.W.2d 866, 867 (Mo.1971). The fact that defendant may have been aware of the specific acts of violence directed toward others does not change this rule, *State v. Maggitt,* 517 S.W.2d 105, 107 (Mo. banc 1974); *State v. McDonald,* 527 S.W.2d 380, 381 (Mo.App.1975); nor would this rule be altered by the fact that the specific acts of violence were directed against immediate members of defendant's family and were known by defendant. *State v. Ball,* 529 S.W.2d 901, 908 (Mo.App.1975). This point has no merit.

■ Defendant also contends there was sufficient evidence for the jury to find that Robert died from some cause other than his abdominal wound. Based upon this characterization of the evidence, defendant argues the trial court erred (1) in failing to submit the "other cause" of death as a specific negative defense and (2) in failing to instruct on "felonious assault without malice aforethought", a different and "lesser" offense which was supported by the evidence. Both of these points are without merit.

Defendant's characterization of the evidence is not supported by the trial record. There is not a scintilla of evidence indicating that Robert died of some cause unrelated to the stabbing. The testimony of the doctors who treated Robert unequivocally confirm the opinion of the doctor who performed the autopsy on Robert. The stabbing caused Robert's death. Defendant is not relieved of his responsibility because septicemia contributed to Robert's death, *State v. Cooley,* 387 S.W.2d 544, 548–549 (Mo.1965). Since defendant's characterization of the evidence is incorrect, his arguments based upon this characterization are also incorrect.[4]

4. Under defendant's construction of the evidence, Robert died of natural causes and not because of the stabbing. Defendant's theory that Robert died of natural causes is nothing more than a denial of the state's theory that Robert died because of the stabbing. Thus,

even if defendant's construction of the evidence were correct, he would only be entitled to a converse instruction and not an instruction on a special negative defense. *See* MAI–CR 2.04, *Notes on Use,* n. 2–Fifth; *cf. State v. Cummings,* 516 S.W.2d 49, 50 (Mo.App.1974).

 Defendant also attacks the verdict directing instruction on manslaughter because it was not modified to reflect the fact that defendant stabbed Robert "causing injuries which became infected and resulted in his death".[5] This modification is acceptable, but it is not mandatory. *See* MAI–CR 15.00, *Supplementary Notes on Use*, n. 6; *see also* MAI–CR 6.02, *Notes on Use*, n. 2. Defendant did not request the modification at trial and, on the present record, its absence was not error.

 Finally, defendant contends the self–defense instruction was an improper comment on the evidence because it refers to the "killing" of Robert six different times. This instruction is a verbatim tracking of MAI–CR 2.40. Any unnecessary deviation from this pattern instruction would have been error. *State v. Vernor*, 522 S.W.2d 312, 316–317 (Mo.App.1975).

The judgment of the trial court is reversed and the cause remanded for trial.

SMITH, P. J., and ALDEN A. STOCKARD, Special Judge, concur.

---

**5.** The pertinent part of this verdict directing instruction reads: "If you find and believe . . . defendant caused the death of Robert Ivicsics by stabbing him . . . .".