STATE of Missouri,
Plaintiff–Respondent,

v.

Dana HALL, Defendant–Appellant.

No. 52275.

Missouri Court of Appeals,
Eastern District,
Division Two.

Dec. 29, 1987.

Motion for Rehearing and/or Transfer
Denied Feb. 4, 1988.

Application to Transfer Denied
March 15, 1988.

Stormy B. White, Asst. Public Defender, Clayton, for defendant-appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PUDLOWSKI, Judge.

Defendant, Dana Hall, appeals from his conviction for second degree murder in violation of Section 565.021, RSMo 1986, first degree assault in violation of Section 565.-050, RSMo 1986, and two counts of armed criminal action in violation of Section 571.-015, RSMo 1986. The defendant was sentenced to one concurrent and three consecutive terms of twenty-five years imprisonment. We affirm.

On October 23, 1985, defendant shot and killed Guy Mudd, Jr., and shot and injured his father, Guy Mudd, Sr., as the victims were leaving the residence of Judy Smith, who lived with her two daughters in the house next door to the defendant. The victims had stopped to visit Smith, the elder Mudd's girlfriend, on their way home from work because Smith had been upset by the recent bizarre behavior of the defendant whose romantic advances she had refused. At approximately 6:30 p.m. the Mudds left the Smith home in their truck and began to drive past the home of the defendant. As the Mudd truck passed in front of the defendant's house, defendant ran toward the driver's side of the vehicle pointing a shotgun at the men in the truck. The father, who was driving the truck, stopped. The son jumped out of the truck and took cover behind the right front tire. Then he stood up, looked at the defendant and shouted, "You crazy bastard." In response, defendant fired a shot striking the son in the upper body. He died a short time later.

After the first shot, the father leaped from the truck and ran toward the rear of his vehicle. As he ran, he was shot in the back of the head and neck. Although he was dazed, he was able to continue across the street to shelter.

Defendant, on the other hand, testified that he fired the shots at the Mudds because they had been threatening him, and, on the evening in question, Guy Mudd, Sr., had menacingly approached his front door with a tire iron. The defendant claimed that he fired the first shot without trying to hit anyone, and the second shot only after Mudd ordered his son to shoot the defendant.

When the local police from the small community of Rock Hill arrived, they secured the area and surrounded the defendant's house. Defendant, unknown to the police, had left the house by the back door before they arrived. Later in the evening, when they realized the defendant had escaped, the police immobilized the defendant's vehicle, which was parked in his driveway, by puncturing a tire. No further surveillance transpired until the following morning when a Rock Hill policeman observed the same vehicle parked on the street behind the defendant's residence with all four tires intact. At the same time, he saw a man he believed to be the defendant running down the street away from the area. After an unsuccessful search of the area, the police officer determined it would be both futile and risky to immobilize the vehicle again in light of the circumstances and called for its removal. Because he was concerned about the possibility that the defendant would take flight in his car, the police officer impounded the vehicle and had it towed to the police headquarter's lot where an inventory search was conducted.

Later in the day, the defendant surrendered to the police. He led them to a wooded area near the location where the vehicle had been observed previously. There the police discovered the weapon that had been used by the defendant.

Defendant contends that the trial court erred in overruling his motion to suppress the evidence found during the inventory search of his car because the warrantless search of his legally parked automobile was not conducted pursuant to a valid exception to the warrant requirement. The search revealed a plastic box on the back seat which contained documents which indicated that the defendant had hired a pri-

vate investigator to trace the license plates on the Mudds' truck. The state introduced the documents to establish that the defendant had been stalking the Mudds.

■ This court has held that "[a] routine warrantless inventory search is constitutionally sanctioned provided the initial seizure of the car was legitimate and the search reasonable in scope." *State v. Holt*, 695 S.W.2d 474, 477 (Mo.App.1985). The police officer testified that the reason for the seizure was his concern that the defendant would once again repair the vehicle and flee. He knew that Hall was still at large. Because of the sighting, he assumed Hall was in the vicinity and he knew that the murder weapon had not been found. To prevent Hall's possible further flight the police officer impounded the vehicle. Among the exceptions to a search and seizure without a warrant are "searches to prevent the flight of a criminal." *State v. Epperson*, 571 S.W.2d 260, 263 (Mo. banc 1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979). The police were convinced that the defendant had replaced the deflated tire and repositioned the car for an escape. The police action of seizing the vehicle under the circumstances was reasonable and was not a pretext for avoiding the warrant requirement.

■ Once it has been established that the seizure was justified, a routine inventory search may be conducted for the purpose of safeguarding the defendant's property and protecting the police from future claims. *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). As the Supreme Court recently held, closed containers found in a vehicle may be opened and inventoried by the police. *See Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (upholding the search of a backpack and the closed containers and sealed envelope found within it). The scope of the inventory search in this case was reasonable. The trial court did not err in overruling the defendant's motion to suppress.

Defendant's second assertion is that the trial court erred in sustaining the prosecution's objection to the defendant's testimony describing the victim as an "ex-con" and in ordering the jury to disregard the particular statements in which such reference was made.

Before the trial began, the court heard the state's motion in limine concerning anticipated references to the past conviction of the victim, Guy Mudd, Jr., for stealing. The court ruled that any reference to past convictions of the victim were to be excluded from testimony but allowed the defendant to testify to any threats made to him or his knowledge of the victim's reputation in the community for violence. The defense attorney was present and aware of the court's ruling excluding references to the victim's past conviction; nevertheless, the following dialogue occurred during the defendant's testimony.

Defendant was asked by his attorney:

Q Did Judy ever threaten you in any way?

A Well that evening, because of the fence matter, she threatened me with her boyfriends.

Q Can you tell the jury what you recall was said by Judy?

A Well, she said that my boyfriends are ex-cons and the police don't mess with them. They don't care about getting in trouble with the police and they are going to take care of me.

After a discussion at the bench, the court told the jury, "The jury is specifically and directly instructed to disregard the last answer." Defendant's attorney resumed questioning and shortly thereafter asked:

Q What were they supposed to do to you?

A That he was going to take care of me.

Q Did she explain to you or did you know what that meant?

A Well, she said that they was ex-cons.

After a brief recess, the court instructed the jury, "The jury is instructed to disregard the last statement of the Defendant."

■ The trial court did not err. "Evidence of prior threats, the reputation of turbulent disposition of the victim and de-

scribed acts of violence upon the defendant are admissible and serve a duplicate role as proof of fact of the aggressor and as proof of the fact of the reasonableness of the defendant's apprehension at the time he resorts to physical force for defense." *State v. Hafeli*, 715 S.W.2d 524, 530 (Mo. App.1986). Nevertheless, evidence of the violent disposition of the victim must be proved by testimony concerning general reputation and not by specific acts of violence which are not connected with the defendant. *State v. Ivicsics*, 604 S.W.2d 773, 781 (Mo.App.1980). This is especially true in this case where there was no indication that the alleged criminal record of the victim was the result of any crimes of violence.

The trial court did not order the jury to disregard the defendant's testimony as to the threats, and we find no evidence that the court's ruling indicated to the jury that such a threat did not occur. The fact that the jury did not find the defendant guilty of first degree murder indicates that the jury considered the circumstances about which the defendant testified and that the defendant was not prejudiced.

The judgment of the trial court is affirmed.

STEPHAN, P.J., and DOWD, J., concur.