**STATE of Missouri, Respondent,**

v.

**Luther W. JOHNSON, Jr., Appellant.**

No. WD 58395.

Missouri Court of Appeals,
Western District.

Submitted March 8, 2001.

Decided June 29, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 28, 2001.

Application for Transfer Denied
Oct. 23, 2001.

---

Susan L. Hogan, Appellate Defender, Kansas City, for Appellate.

John M. Morris, III, Asst. Atty. Gen., Jefferson City, for Respondent.

Before JAMES M. SMART, JR., P.J., HAROLD L. LOWENSTEIN and VICTOR C. HOWARD, JJ.

PER CURIAM.

Appellant Luther W. Johnson, Jr., was convicted after a trial by jury of one count each of murder in the second degree, Section 565.021 and armed criminal action, Section 571.015. Johnson was sentenced to twenty years on the murder charge and ten years for the armed criminal action charge, with the sentences to run concurrently. Johnson appeals. The points relate to the prosecutor's comments regarding appellant's post-arrest silence, failure to instruct on defense of habitation, and comments and inferences relating to the failure of a witness to appear to testify on behalf of defendant. We reverse and remand on the issue of failure to instruct on defense of habitation.

## Factual Background

Johnson does not contest the sufficiency of the evidence to sustain the conviction. Viewed in the light most favorable to the verdict, the evidence at trial is as follows: In March of 1997, Appellant Luther Johnson lived with his wife, Carolyn Johnson, at 3912 Park, Kansas City. The Johnsons had been separated for some time, but in January, 1997, Mr. Johnson moved back in. Ms. Johnson's daughter (S.C.), Latasha McBride (then age 21), and Lashonda Johnson (then age 15) also lived in the house, along with another occasional resident named Shameka Walker.

On March 29, 1997, Latasha was planning a cookout at the home for the next day. Appellant told Latasha and Shameka that he did not want them to invite Charles Watkins (then age 18) and his cousin, David Eddie Taylor, to the cookout. Watkins had recently been dating Lashonda. Appellant disapproved of the relationship because he thought Watkins looked too old to be dating Lashonda, age 15.

The evening of the next day, the date of the incident, appellant, Carolyn, Latasha, Lashonda, and Shameka were having a barbecue on the front porch of the home. Two other friends were also present. Around 7:00 p.m. both Watkins and Taylor arrived at the house, and entered the house to see the girls and to pick up a cassette tape from them. Johnson was upset about the boys being there and told them to leave. Watkins told appellant he would leave only if Carolyn Johnson told him to. Ms. Johnson apparently said that since the young men were not bothering anyone they could stay. Watkins, Taylor, Latasha, and Lashonda then went out onto the front porch. Appellant again insisted

the young men leave and locked all of the doors and windows in the house. Appellant further instructed all those inside the house not to open the door.

Watkins and Taylor then left, but returned a short time later to talk with Lashonda on the steps. When Johnson saw Watkins and Taylor, he went to the bedroom and retrieved a gun. Johnson then went to the door, showed the gun to the young men and again told them to leave. Latasha assured the young men that appellant would not shoot anyone. Johnson said, "You don't think I will shoot you?" Watkins responded by saying that if he pulled a gun, he'd better use it. Meanwhile, people inside the house were singing a rap song that contained the refrain, "If you had a trigger, you would pull it." Johnson apparently then closed the door and told Ms. Johnson to tell the boys to leave. Johnson then returned to the door. Although there are differences in the testimony about what happened next, there is no dispute that soon thereafter, Johnson fired a shot, striking Watkins in the abdomen.

Police responding to the scene found Watkins lying on the grass between the sidewalk and the curb. Watkins was taken to the hospital, where he died from his injuries. Johnson fled to Kansas. Later, Johnson was arrested in Kansas and was returned to Missouri in January of 1999 for prosecution.

At trial, Johnson raised the issue of self-defense. Johnson testified concerning prior incidents which lead him to believe that Watkins was a dangerous individual who carried a weapon, and posed a specific threat to him. On the evening of the incident, Johnson testified, he was in a bedroom when he heard the music suddenly stop in the other room. Lashonda ran down the hall to her room and slammed the door. Johnson went to the living room; seeing Watkins, he told him to leave. Watkins responded he would not leave unless Ms. Johnson told him to go.

Appellant returned to the bedroom, got an unloaded shotgun, returned, pointed the gun at Watkins and told him to leave. Watkins went outside, where Taylor was sitting on the porch. Watkins told appellant, "If you pull that gun on me, you better use it." Johnson saw something that looked like a weapon stuffed into the back of Taylor's pants. The boys then left. Johnson got everyone but Latasha and Lashonda into the house and locked the doors and windows. Johnson put the gun up.

Shortly thereafter, Johnson heard something on the porch and the sound of someone trying to open the screen door. Johnson looked out and saw Watkins on the porch. Johnson retrieved the shotgun and loaded it. Johnson stood next to the door, then he saw the doorknob shaking. Johnson opened the inside door to find Watkins standing in front of the screen door. Watkins was upset, stating: "You pull that gun on me I should f___ you up" and "I'm going to make you use that gun." Watkins then grabbed the screen door. As Johnson and Watkins struggled for the door, Johnson thought he heard the slide chamber of an automatic gun. Johnson thought this confirmed the existence of a weapon. Johnson pushed Lashonda away from the door, at which time Taylor grabbed the screen door. Johnson then fired one shot. At trial, the court allowed an instruction on self-defense, which was requested by appellant. After deliberating, the jury returned a guilty verdict for murder in the second degree and armed criminal action. Johnson appeals.

### Defense of Habitation

■ We consider Johnson's second point first. In his second point, Johnson

argues that the trial court erred in failing to submit an instruction on the issue of defense of premises (MAI CR3d 306.10).

Johnson argues that, if supported by the evidence, an instruction on justifiable homicide must be submitted to the jury, whether or not the defendant requests the instruction, citing *State v. Ivicsics,* 604 S.W.2d 773, 776 (Mo.App.1980). Johnson then sets out the proposed instruction and argues that the evidence that would have supported an instruction on defense of habitation. The state does not deny that it was error not to give the instruction on defense of habitation.[1] The state responds by arguing that the instruction on self-defense and defense of habitation are practically identical, thus, the jury considering the same factors, would have found appellant guilty anyway. In other words, there was no harm to appellant as a result of the failure to submit the instruction on defense of premises.

The "Notes on Use" to MAI–CR3d 306.10 indicates that the "burden of injecting the issue" of defense of premises is on the defendant. However, this burden is only a burden to introduce evidence. Whenever there is evidence supporting

this defense, *this instruction must be given.*" *MAI–CR3d* 306.10 Notes on Use fn.2 (1995) (emphasis added).[2] In *Ivicsics,*[3] the court was faced with a situation very similar to the instant case. A self-defense instruction was given but a defense of habitation was not. In *Ivicsics,* Defendant Daniel Ivicsics stabbed his brother Robert, who subsequently died. Prior to the stabbing, defendant and his brother were not on friendly terms. "Robert had threatened to kill defendant, and, just prior to the stabbing, he had threatened to shoot defendant." *Ivicsics,* 604 S.W.2d at 775. On September 19, 1977, defendant and Robert began arguing and fighting inside defendant's trailer. Defendant ordered Robert to leave. Robert refused. A third party then forcibly pushed Robert out of the trailer. *Id.*

What happened next was disputed. The state's evidence indicted that Robert ran to his car, reached under the seat, and turned back toward the trailer. *Id.* Defendant ran from the trailer meeting Robert ten to fifteen feet from the trailer, at which time Robert "swung at," "grabbed," or "reached out for" defendant, and defendant stabbed Robert in the abdomen with a bayonet. *Id.* Defendant's evidence was

---

1. It is well established in the law that one who seeks to use defense of habitation to justify a homicide must be free from fault (and cannot himself or herself been acting in violation of the law). *See* 40 Am Jur 2d HOMICIDE §§ 149, 167. The state makes no argument here that Johnson was not eligible to raise the defense because of his conduct. The state practically concedes error by addressing only the issue of prejudice.

2. Similar language is found in MAI CR3d 306.06, the instruction on self defense; accordingly, it was held in *State v. Blackman,* 875 S.W.2d 122, 132 (Mo.App.1994) that if there is substantial evidence of self-defense, the court must instruct the jury on self-defense whether or not defendant requested the instruction. *See also State v. Austin,* 367 S.W.2d 485, 486 (Mo.1963) (if any competent

evidence on self-defense, the court must instruct on that issue whether or not requested); *State v. Shiles,* 188 S.W.2d 7, 9 (Mo.1945) (defense of habitation must be given in proper case along with self-defense).

3. *State v. Ivicsics,* 604 S.W.2d 773, was decided in 1980, at a time when the Supreme Court rules did not require specific objections to instructions at trial, as long as the objection was preserved in the motion for new trial. Compare former Rule 26.02(b) to the current Rule 28.03. Nevertheless, it appears from the Notes on Use to MAI CR3d 306.10 that the holding in is still the law: in a homicide case, where the evidence raises the issue of justifiable homicide, the appropriate *Ivicsics* instruction must be given, whether requested or not.

that after Robert was pushed from the trailer, defendant went to his room and got an old army bayonet. *Id.* As defendant returned to the door of his trailer, Robert was attempting to force his way back in through the doorway. *Id.* Thinking Robert had a gun, and fearing for his life, defendant stabbed Robert "at the front door of the trailer" at which time Robert staggered back and fell in the street. *Id.* Defendant Ivicsics then fled in his car, while Robert was being taken to the hospital. *Id.* Robert died on October 6, 1977, from septicemia, a bacterial infection of the blood, developed at the site of his abdominal stab wound. *Id.* at 776.

The jury was instructed in *Ivicsics* on the issue of self-defense, but not on the issue of defense of premises (habitation). *Id.* While it is not completely clear if this failure to instruct on defense of habitation was the result of the defendant's failure to request such an instruction, the clear implication from the case is that the defendant did not request the instruction. *Id.* The court then set out the general rule of law for self-defense, stating:

> Self defense grants a defender the privilege to use deadly force in the effort to defend himself against personal harm threatened by the unlawful act of another, if the defender has reasonable cause to believe that (1) there is immediate danger the threatened harm will occur, (2) the harm threatened is death or serious bodily injury and (3) deadly force is necessary to overcome the harm as reasonably perceived.

*Ivicsics,* 604 S.W.2d at 776. The court then noted the similarities between the defenses of habitation and self-defense, but distinguished the two, stating:

> Moreover, the Court [Missouri Supreme Court] noted the two defenses differ in only two respects. Defense of habitation differs from self defense by

exempting the occupant from the duty to retreat, if feasible before using deadly force. It also differs from self defense by authorizing "protective acts to be taken earlier than they otherwise would be authorized, that is, at the time when and place where the intruder is seeking to cross the protective barrier of the house." ... In short, in Missouri, defense of habitation is nothing more than accelerated self defense, and the difference between the two defenses is a function of time and space.

*Id.* at 777 (internal citations omitted).

Picking up on the language in *Ivicsics* referring to retreat, the state argues in this case that there was no duty of retreat because there was no opportunity for Johnson to retreat. Had Johnson closed the door to hide in the house, there was a risk that the victim would follow him inside. Thus, says the state, under this fact scenario there would be no difference between defense of premises and self-defense. Appellant was not prejudiced, says the state.

The *Ivicsics* court set forth the general rule of law of defense of habitation in paraphrase form stating:

> The defense of habitation grants the lawful occupant of a dwelling the privilege to use deadly force to prevent an attempted unlawful entry into the dwelling, if the occupant had reasonable cause to believe that (1) there is immediate danger the entry will occur, (2) the entry is being attempted for the purpose of killing or inflicting serious bodily harm on the occupant and (3) deadly force is necessary to prevent the unlawful entry.

*Id.* at 777 (internal citations omitted). The court noted that this paraphrase, while making the similarities between the defenses obvious, also emphasized the crucial difference between the two defenses.

In self defense, the defender must have reasonable cause to believe the danger of harm from personal attack is immediate before he is justified in responding to the attack. In defense of habitation, the defender need not wait until the danger of harm is immediate; rather, he may respond when he has reason to believe there is immediate danger the unlawful entry will occur. The significance of this difference is apparent when the defender is a great distance from a closed doorway which an intruder, bent on violence, is attempting to enter. Under those facts, a jury could sensibly find the defender was justified in using deadly force in preventing the entry because the defender has reasonable cause to believe there was immediate danger the entry would occur, but, because of the defender's distance from the doorway and the time needed to cross the distance, the jury could not with equal sense find the defender had reasonable cause to believe he was in immediate danger of personal harm. Arguably, as the distance between the defender and the doorway is lessened and as the time needed to cross this distance is thereby lessened, the difference between defense of habitation and self defense is lessened, and, at some point, perhaps when the defender is immediately adjacent to the doorway, defense of habitation and self defense merge and become the same defense. At this point, an instruction on either defense may suffice. However, the determination of the point in time and space that the two defenses merge is an abstract and theoretical determination. The trial court should not be required to make and should not make this determination. As long as the evidence shows the intruder has not entered the dwelling, an instruction defining the defense of habitation must be given so the jury can focus on the immediacy of the danger of the entry rather than on the immediacy of the danger of the harm.

*Id.* at 777–78.

In the instant case, Johnson injected the issue of defense of habitation when he testified on his own behalf. Appellant testified that Watkins and Taylor had left, so he locked the house, although two of the girls chose to remain outside. A short time later, Johnson heard a commotion on the porch, so he looked out the window to see that Watkins had returned. Appellant testified:

Q. Okay. So when you hear the commotion on the porch, you look out the window and see that Charles Watkins back again, what do you do?

A. Well, I went back into the bedroom and I got the 12–gauge shotgun from under the bed and loaded it. I came back to the front door and I stood next to the side of the front door. The screen door apparently he tried to open it or did open the screen door because the wooden knobs were being jingled, so it was being jingled

Q. So you saw the front door moving?

A. The knob, yes.

Q. And that was before or after you went back to get the shotgun loaded?

A. I went and got the shotgun, came back to the door and stood next to the door. That's when the knob was shaking. So naturally that told me that the screen—but I remember locking it—both of those doors. The screen door was locked. And apparently he had opened that screen door and was trying the knob to see if the door was open.

Q. What was your reason for going back and getting the gun and loading it?

A. When I would be out there and I saw who I thought was Watkins, I just had a bad feeling. It just made me believe that he came back for a reason and the only thing I could think of was he wanted to start some trouble, so I stood by the front door, and I told, you know, my wife, she was sitting in there, too, that if he—I said if he tries to come in the front door, I'm going to shoot. If he tries to come through the door, I'm going to shoot.

After explaining that he [Johnson] opened the wooden door to find Watkins standing on the other side of the screen door, Johnson testified that Watkins became more hostile to Johnson, telling him he was going to make him use that gun. Then, the following colloquy occurred:

Q. So what happened between the two of you at that point?

A. Well, my daughter Shay came— may daughter Shay came in there where I was standing at the screen door and she stood there, and she might have said something to him, just go on and leave. And so he wasn't going anywhere. You know, he made it known that he wasn't going anywhere.

Q. How did he make that known to you, Mr. Johnson?

A. He stood there, just kind of rocked back and forth, and kept saying, you know, "I'm going to make you use that gun."

Q. So what happened then?

A. Well, what he did he grabbed the door there, the screen door, he grabbed a knob, so he had one side and I had the other side. So we was tugging. It was like king of a tug of war there for a minute. And he finally let go but what got my attention was that the fact that he was standing to his left. He kind of—he would glance over to his left, and he did that a few times, and he gave—that's when I kind of thought that there was somebody else out there besides Tasha. I had no idea at that moment that Eddie was out there as well, that he was up against the wall of the porch where you couldn't see him.

When I first looked out my direct line of view, I didn't see anybody but him but I knew he was out there. And the reason I knew it was because I heard what I'm sure was a slide chamber on one of those automatic guns. That's what it sounded like. That just confirmed what I had already thought earlier that he did, in fact, have a weapon.

So I kind of panicked and what I did, I told my daughter Shay just to move and I just threw her over to the side away from the door. Then Eddie [Taylor] jumped in front of the door, he snatched the door, Chucky [Watkins] ran right in back of him. They collided. They collided right at the corner of the door, right at the corner of the door. So I fired one shot then. He already started to open the door. He was snatching on the door and I was concerned then that he not fire through, shoot through that front door or worse yet, try to run in that front door on us, you know, so that was my main concern, to stop him from coming through that door or firing the gun if that's in fact, what he was trying to do. . . .

Johnson's testimony clearly indicates that he was trying to keep Taylor and Watkins from entering the house. Johnson testified that he and Watkins struggled over the screen door, and that someone was

"snatching on the door" when Johnson fired the shotgun.

Given Johnson's testimony injecting the issue of defense of habitation, coupled with the strength of the mandate from *Ivicsics* that "[a]s long as the evidence shows the intruder has not entered the dwelling, an instruction defining the defense of habitation must be given ..." we conclude that the court erred in failing to instruct on defense of habitation.

It is difficult to fault the trial judge for failing to instruct on this defense when no one else, including defense counsel, realized that the instruction should have been given. Nevertheless, the law clearly places on the court the responsibility for the instruction, even when not requested. *Ivicsics;* MAI–CR3d 306.10 Notes on Use fn. 2 (1995).

■ Having determined that there was a duty to submit the instruction on defense of habitation, even though it was not requested, we must decide whether the failure was prejudicial. Rule 84.13(c). In making that determination, we can consider the fact that the defense did not request the instruction. Also, we can consider the fact that self-defense and defense of habitation are closely related, and the fact that the jury rejected the concept of self-defense in this case. However, we are hard-pressed to say that the defendant might not have received a more favorable response from the jury to a defense of habitation instruction, providing the jury believed Johnson's testimony, because the defense of habitation essentially allows use of lethal force sooner than does a self-defense instruction, since the focus is on the danger of *entry* as opposed to the immediacy of the danger of harm. This is not a case where the evidence is such that we can say, without making a credibility determination reserved for the factfinder, that the evidence of guilt of murder was

overwhelming and therefore the error was immaterial. There were issues here for the jury's resolution under proper instruction. Accordingly, we are constrained to hold that the failure to instruct on defense of habitation here was prejudicial error.

The judgment is reversed and the case remanded for a new trial.