**STATE of Missouri, Plaintiff–Respondent,**

v.

**Gary W. BIGGS, Defendant–Appellant.**

No. 24730.

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 25, 2002.

Ellen H. Flottman, Assistant State Public Defender, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, and Shaun J. Mackelprang, Assistant Attorney General, Jefferson City, MO, for Respondent.

JAMES K. PREWITT, Presiding Judge.

Following jury trial, Gary W. Biggs ("Defendant") was convicted of murder in the first degree, § 565.020, RSMo 2000, and armed criminal action, § 571.015, RSMo 2000. With two points relied on, Defendant claims that the trial court

abused its discretion by (1) allowing evidence that Scott Biggs ("Scott") talked to a preacher before stating that he and Defendant killed Willie Mae Vasquez ("Vasquez") and (2) overruling Defendant's objection to the prosecutor's swinging of the alleged murder weapon, a hatchet, during closing argument.[1]

Defendant does not challenge the sufficiency of the evidence to sustain his convictions. Viewed in the light most favorable to the verdict, the evidence shows that on July 26, 2000, Defendant and Scott, who are cousins, stopped at a local truck stop in Scott City, purchased a 30–pack of beer, and proceeded to an area along the Mississippi River called the sand bar to go fishing. Both men became intoxicated and at one point Defendant asked Scott if he could ever kill anybody.

Scott initially told Defendant, "there [is] no way I could get by with killing somebody," but later told Defendant that he could kill Vasquez, a woman with whom he was having a sexual relationship. Vasquez had been asking around town about Scott, and he was concerned that his girlfriend would find out about the affair. Defendant stated that he would like to watch Scott kill her.

Defendant and Scott began to plan the murder. They first retrieved a shovel and a hatchet from Defendant's house and then returned to the river area and dug a grave. While Defendant stayed at the site, Scott went to pick up Vasquez who willingly accompanied Scott on the pretense of going fishing. As Scott and Vasquez approached the sand bar area, Scott honked the horn, which was the predetermined method by which to inform Defendant of their arrival.

With fishing equipment and beer in hand, Scott and Vasquez entered the woods, passing by Defendant, whom only Scott appeared to notice was there. As Scott placed the fishing poles on the ground he heard a sound "like a .22 going off." He turned around to see Defendant standing over Vasquez with the hatchet above his head. Vasquez was lying face down with blood emanating from her head.

Defendant told Scott to hit her; if he did not, Defendant informed Scott that he would "be laying beside of her." Scott picked up the hatchet and hit Vasquez once in the back of the head and threw the hatchet to the ground. Defendant picked it up, hit Vasquez again, and told Scott to get the shovel. When Scott returned he heard what he described as "the death rattle" or Vasquez taking her last breath. At his point, Defendant picked up the shovel and hit Vasquez across the head and said, "Shut up, bitch."

Defendant and Scott dragged the body to the grave, but it was not big enough. Defendant stood on Vasquez' legs to push her body into the grave and Defendant and Scott buried her. They covered up the tracks leading to the grave, as well as the blood at the point of the initial attack; they also threw the visor she had been wearing into the weeds.

Although the two had originally planned to go fishing after the murder, they instead left the area, but did go back once to make sure Vasquez was still buried. As they left the area to drive to Defendant's house, they discarded their shoes in a ditch. The shovel and hatchet were left at the house.

When Vasquez was reported missing, Defendant was concerned that they needed

---

1. As Scott Biggs shares the same last name with Defendant, we will refer to him by his first name to reduce any possible confusion.

to move the body and Scott was concerned that he would be questioned about her disappearance. On August 7, 2000, Scott was contacted by the police and asked to go to the Scott City Police Department to "identify some stolen property." On August 9, 2000, Scott went to the department and was questioned regarding Vasqeuz' disappearance.

Scott initially denied having any knowledge of her whereabouts, but eventually acknowledged his relationship with her, and then admitted that he had helped to bury the body, but blamed the murder on Defendant. An autopsy revealed that Vasquez had died of cranial cerebral injuries, and that there were three "chop-like defects" and several smaller "chopping defects" on the back of her skull; she also had a several skull fractures. It was at least October of 2000 before Scott admitted his involvement in the planning and execution of the murder.

On December 1, 2000, Defendant was charged by information with one count of murder in the first degree, § 565.020, RSMo 2000, and one count of armed criminal action, § 571.015, RSMo 2000. Following a change of venue to Pulaski County on February 28, 2001, Defendant was charged there, with amended information filed on July 26, 2001.

As part of a plea bargain agreement, Scott pled guilty to murder in the second degree and testified for the State at Defendant's trial. The jury found Defendant guilty of murder in the first degree and armed criminal action. He was subsequently sentenced to consecutive sentences of life without parole on the murder count and 50 years for the armed criminal action. This appeal followed.

In his first point, Defendant claims that the trial court abused its discretion by overruling his objection to the introduction of evidence that Scott talked to a preacher prior to stating that Defendant and Scott killed Vasquez because such evidence was more prejudicial than probative; irrelevant, in that it interjected religion into the jury's consideration; and improper, as it only served to bolster Scott's credibility.

During cross-examination of Scott, defense counsel questioned him about how the information he gave to police changed over time, and highlighted his plea agreement.

Q: (by defense counsel): But you are telling the truth here today?

A: (by Scott): Yes, I am.

Q: And so far that would be the first, wouldn't it?

[The Prosecution]: Objection; argumentative.

[The Trial Court]: Sustained.

. . . .

Q: Okay. And after that talk about the death penalty, you finally told Detective Bledsoe that you could take them to [Vasquez'] body; is that correct?

A: That's correct.

Q: And at that point you executed a written voluntary statement; is that correct?

. . . .

A: Yeah. That's correct.

Q: You read that statement over before you signed it. Correct?

A: I did. That's correct.

Q: Okay. We'll call this the Bledsoe statement.

. . . .

Q: Now, in this version of your story you say that [Defendant] killed [Vasquez]?

A: That's correct.

Q: You said in that statement that you brought her out there just to fish?

A: Yeah. That's correct.

Q: That was a lie?

A: Yes.

. . . .

Q: In this version of your story, you don't hit [Vasquez] with a hatchet at all?

A: No. I just told them that I helped bury her.

. . . .

Q: Now, you also told Deputy Bledsoe that you didn't know where the shovel was in that statement?

A: That's correct. Yeah.

Q: And you didn't know what happened to the hatchet?

A: No, I didn't.

Q: Those are both lies?

A: Right.

Q: And you didn't mention any shoes in that statement?

A: No, I didn't, until later on the next day.

Q: Now, all of that that we've been talking about is pretty much lies. Right?

A: Right.

Q: Later you take Detective Bledsoe to a shovel . . . . tell [him] about a hatchet . . . . [and] tell [him] about some shoes?

A: That's correct.

Q: Now, the next time you told stories was at [Defendant's] preliminary hearing; is that correct?

A: That's when I come out and told them the whole deal.

Q: That was on November 22nd?

A: Right.

. . . .

Q: Now, in this story you admit that the murder was planned?

A: Right.

. . . .

Q: Now, in the preliminary hearing version of your story, you also admit that you dug a grave?

A: Right. That's correct.

. . . .

Q: That part about you digging the grave wasn't in the Bledsoe statement, was it?

A: Not that I know of.

Q: And it wasn't in the first Wolsey statement? [Jerry Wolsey, who owned an investigative and security agency at the time and had been hired by Vasquez' son-in-law to investigate her disappearance.]

A: No.

Q: And it wasn't in the second Wolsey statement?

A: No.

Q: That was a new fact to the preliminary hearing version of the story?

A: That's correct.

. . . .

Q: Okay. Now, your testimony today is part of a deal that you made with the— with the prosecutors. Is that not true?

A: They come—my lawyer come to me and told me they would make a deal with me, but I didn't want their deal.

Q: Your testimony is part of a deal that you have made; isn't that correct?

A: That's correct.

Q: You made a deal to cut your losses, didn't you?

. . . .

Q: Okay. The deal you made, though, was for you to plead guilty to murder in the second degree?

A: That's correct.

Q: You don't have to worry about murder in the first degree anymore, do you?

A: No.

. . . .

Q: You haven't been sentenced yet?

A: No.

Q: They're waiting to see how you do before your punishment is decided; isn't that right?

[The Prosecution]: Objection; argumentative.

[The Trial Court]: Sustained.

. . . .

Q: [Scott], you stand here today a liar and a murderer?

A: No.

Q: Which one are you not?

A: I may have lied on what happened at first, but I'm telling the truth now.

Q: So you are saying you are a murderer but not a liar, but you have lied in the past?

A: I lied about what happened, yes, at first.

Q: Well, [Scott], you entered your plea, you got your deal and now you don't have to worry about anyone else hearing your death rattle, do you, [Scott]?

[The Prosecution]: Objection; argumentative, Judge.

[The Trial Court]: Overruled.

On re-direct, the prosecutor questioned Scott in the following manner:

Q (by the prosecution): Okay, just a couple of more things, Scott. You were asked about the preliminary hearing in November of last year. Do you remember that?

A (by Scott): Yeah.

Q: At that preliminary hearing, it was characterized as this is the newest version of your story at that time. Was that the first time you had ever told anybody—

A: No.

Q: —about this?

A: No, it wasn't.

Q: I mean, about your own involvement? It was not?

A: No.

Q: Okay. At the preliminary hearing on November 22nd, did you attempt to tell the truth like you attempted to tell the truth here today?

A: Yes, I did.

Q: And as far as you are concerned, what you said on November 22nd, ... should that be consistent with what you said here today?

A: Yes, it is.

Q: Now, my question to you is, was that the first time you had ever told anybody the truth about what happened?

A: Yes.

Q: On November 22nd was the first time you ever told—

A: Oh, no. I told—

Q: Who did you first tell the truth to?

A: The first person I told the truth was when I was talking to one of the officers down in Chaffee.

Q: Okay. Do you remember who that officer was?

A: Officer Wayne Hampton. [Jerry Wayne Hampton, Jr., a patrolman for the City of Chaffee.]

Q: Was this before the preliminary hearing?

A: This was way before the preliminary hearing. And I was talking to him, and he asked me, ... Scott, do you believe in God? I said, yeah, I believe in God. He—

[Defense Counsel]: Judge, I'm going to object to this line of questioning. It calls—

[The Trial Court]: It's not the question. It's the answer is not responsive.

[Defense Counsel]: And it's bolstering.

[The Trial Court]: All right. And bolstering as well. Sustained.

Q: Let me ask you this. Did you make any requests at that time?

A: Yes, I did.

Q: What did you ask the officer to do for you?

A: I—

A bench conference was held at which defense counsel questioned whether the prosecutor should be allowed to examine Scott regarding talking to a preacher, claiming it was irrelevant and improper bolstering. The State argued that Scott should be able to testify to the circumstances under which he told the truth the first time. The trial court agreed and overruled defense counsel's objection. The re-direct examination of Scott continued.

Q: Scott, did you ask this officer—what did you ask this officer to do for you?

A: I asked the officer if he could send one of the—a preacher to see me.

Q: And after you asked him this, did a preacher come see you?

A: Yeah, a preacher came to see me.

Q: I'm not asking you to divulge exactly your conversations with this preacher, but after you talked to this preacher—one, is this the individual that you first told exactly what had happened?

A: Yes.

Q: After you talked to the preacher, what did you decide to do?

A: I told—when—after I had talked to the preacher, I asked him—I told him, I said I'm not asking you for no advice or nothing like that, but I said, Do you think I ought to tell my lawyer?

Q: Okay. I understand. But what did you decide to do after your conversations with the preacher?

A: I decided to come out and tell the whole truth.

Q: Now, did you have a lawyer at that time?

A: Yes, I did.

Q: And did you go to your lawyer and tell him?

A: I had my lawyer come down to where I was at, and I told him.

Later, Officer Hampton testified that Scott had requested to speak with a minister, a request that was granted. According to Mr. Hampton, the minister had spoken with Scott on three occasions, all at Scott's request. In closing argument, the prosecutor referenced Scott's discussions with the preacher by stating, "[Scott] requested to talk to a preacher. A preacher comes down.... And he decided after that—he didn't have a deal at that point. He goes to his attorney and he says, I've got to tell you what really happened here."

 On direct appeal, we review the trial court not for mere error, but for prejudice and we will reverse the trial court only if an error was so prejudicial that it deprived Defendant of a fair trial. *State v. Morrow,* 968 S.W.2d 100, 106 (Mo. banc 1998). Trial courts have broad discretion to admit or exclude evidence at trial and this court will reverse only upon a showing of a clear abuse of discretion. *State v. Chaney,* 967 S.W.2d 47, 55 (Mo. banc 1998). A trial court abuses its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Collins,* 72 S.W.3d 188, 192 (Mo.App. 2002). If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Id.*

Defendant argues that the trial court abused its discretion in admitting the evidence because it allowed the State to introduce evidence to which the preacher would be unable to testify because it would be in violation of § 491.060, RSMo 2000, under which a preacher or minister is considered incompetent to testify to "communication[s] made to him or her in his or her professional capacity." Defendant also argues that the testimony inappropriately interjected religion into the trial, which is contrary to Missouri law. *See State v. Debler*, 856 S.W.2d 641, 656 (Mo. banc 1993) ("both sides should avoid excessive Biblical and historical references.").

Regarding § 491.060, RSMo 2000, we agree that the statute would have precluded the preacher from testifying to the substance of his conversations with Scott. *See State v. Kurtz*, 564 S.W.2d 856, 860–61 (Mo. banc 1978). However, as we lean toward a strict construction of such statutes, Scott would not have been so precluded. *See id.* at 860.

■■■ Given the totality of the testimony on Scott's cross-examination and re-direct, Defendant has failed to show how religion was interjected into the trial in violation of caution set forth in *Debler*. On cross-examination, it was clear that defense counsel was attempting to discredit Scott and his testimony and create the inference that he had lied at some point, and thus, the jury may want to disbelieve his testimony at trial. On re-direct examination, it is proper to examine a witness on any matters which tend to refute, weaken, or remove inferences, impressions, implications, or suggestions that may have resulted from the witness' testimony on cross-examination, notwithstanding the facts elicited may be prejudicial to the defendant. *State v. Leisure*, 749 S.W.2d 366, 377 (Mo. banc 1988).

Scott's testimony on re-direct was evidence that he had previously provided aspects of the story that relayed his involvement in the planning and execution of the murder, including to the preacher, his attorney, and at the preliminary hearing. His testimony was of the nature of a prior consistent statement and was admissible under the circumstances of this case to refute and explain any inconsistencies or inferences from his cross-examination testimony. *See State v. Sullivan*, 925 S.W.2d 483, 485 (Mo.App.1996). Point I is denied.

Defendant's second point is that the trial court abused its discretion in overruling his objection to the prosecutor's swinging of the hatchet around during closing argument, where the following statements were made:

> The two women in each of these guys' [Defendant and Scott] lives told you a different story. You have to decide which one of them is telling the truth, and then you decide whether you believe Scott or not. And you know why that is, because if you don't believe Wendy [a witness for Defendant who described Defendant as her boyfriend], if you don't believe [Defendant] was in her apartment, you know where he was at, you know where he was at, he was standing on the shores of the Mississippi with this in his hand (indicating). That's where he was at.
>
> [Defense Counsel]: Judge, we're going to object to the brandishing [of the] hatchet in front of the jury, He's trying—
>
> [The Trial Court]: Overruled. Overruled.

The hatchet was handled during defense counsel's closing argument as well. The context is as follows:

> Well, words have certainly hurt Scott Biggs. Words are what have kept him in jail for the past 14 months. Words

are what has him charged with murder, and words are what have put him on trial where his life hangs in the balance. Just words. Words from the mouth of a liar. Words from the mouth of a murderer. Words from the mouth of a man who did what he had to do to save his own life, the word of Scott Biggs. And that's all there is, words of a murderer.

Did you get a little nervous when the hatchet was this close to him (indicating)? Did you get a little nervous when the shovel was that close to him?

The State argues that Defendant has not preserved this point for review because Missouri law requires that specific objections be made to arguments or statements of counsel, that an objection must call the trial court's attention to the ground or reason for the objection. *State v. Rogers,* 973 S.W.2d 495, 498 (Mo.App.1998). We agree that defense counsel failed to make a specific objection; however, since it does not affect the outcome on appeal, we will give defense counsel the benefit of the doubt that the trial court made its ruling perhaps before defense counsel had an opportunity to state the specific grounds or reason for the objection and review the point.

The trial court has broad discretion in controlling closing argument, and its rulings are reversed only for an abuse of discretion prejudicing the defendant. *State v. Black,* 50 S.W.3d 778, 787 (Mo. banc 2001). A trial court abuses that discretion when it allows statements or arguments by the prosecutor that are plainly unwarranted and clearly injurious to the defendant. *State v. Ozier,* 961 S.W.2d 95, 98 (Mo.App.1998). To establish prejudice, a defendant must show that there is a reasonable probability that, in the absence of the trial court's abuse, the verdict would have been different. *State v. Williams,* 24 S.W.3d 101, 124 (Mo.App.2000).

Defendant argues that there was no reason for the prosecutor's use of the hatchet during closing argument "other than to recall in the jurors' minds the circumstances of [Vasquez'] death—to compel them to imagine suffering it themselves." Defendant is correct that an argument is personalized when the jurors are asked to place themselves in the shoes of the victim and then provided with graphic details of the crime. *State v. Rhodes,* 988 S.W.2d 521, 529 (Mo. banc 1999). Such argument is improper when it suggests a personal danger to the jury or their families. *State v. Ferguson,* 20 S.W.3d 485, 502 (Mo. banc 2000). We fail to see how the prosecutor's statements suggested personal danger to the jurors or their families.

As for the alleged brandishing of the hatchet in front of the jury, under the circumstances of this case, we find that the trial court did not abuse its discretion when it allowed such action. This is consistent with other cases in which the actual murder weapon was waved in front of the jury and no abuse of discretion was found. *See Ham v. State,* 7 S.W.3d 433, 437 (Mo. App.1999) (knife); *State v. Bearden,* 926 S.W.2d 483, 486 (Mo.App.1996) (pruning shears). Point II is denied.

The judgment is affirmed.

RAHMEYER, C.J., and PARRISH, J., concur.