**STATE of Missouri, Respondent,**

**v.**

**Darrell TURNER, Appellant.**

**No. 27778.**

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 16, 2008.

Laura G. Martin, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joshua A. Corman, Asst. Atty. Gen., Jefferson City, for Respondent.

ROBERT S. BARNEY, Presiding Judge.

Darrell Turner ("Appellant") appeals his conviction by a jury of one count of the class A felony of assault in the first degree, a violation of section 565.050; one count of the unclassified felony of armed criminal action, a violation of section 571.015; one count of the class B felony of burglary in the first degree, a violation of section 569.160; and one count of the class D felony of unlawful use of a weapon, a violation of section 571.130.[1] Appellant was sentenced by the trial court as a prior and persistent offender to life in prison on the assault charge; 100 years in prison on the armed criminal action charge; 30 years in prison on the burglary charge; and 7 years in prison for unlawful use of a weapon with the sentences to run consecutively. Appellant alleges two points of trial court error.

Appellant does not challenge the sufficiency of the evidence to support his conviction. Viewing the evidence in the light most favorable to the jury's verdict, *State*

1. All statutory references are to RSMo 2000.

*v. Cole*, 148 S.W.3d 896, 898 (Mo.App. 2004), the record reveals Victim[2] became engaged to Michael Young ("Mr. Young") in early 2004 and the engagement was broken off by Victim in November of 2004 due to, among other things, Mr. Young's drug addiction.[3]

The record further shows that on December 1, 2004, Mr. Young contacted Victim and informed her that he had been "taken" by Boo, his drug supplier, and another man, Stephen Galbreath ("Mr. Galbreath"), who were threatening to hurt him if he was unable to pay them the money he owed. After several urgent phone calls from Mr. Young, Victim agreed to help him. Victim then contacted the police, who aided her in setting up an exchange. Victim took $400.00 and went to Wal–Mart to meet Boo and Mr. Young while the police conducted surveillance. Victim gave the money to Boo and Mr. Young was released.[4]

Several weeks later, on the evening of December 28, 2004, Mr. Galbreath called his girlfriend, Christina Jones ("Ms. Jones"), and asked her to pick him and Appellant up at his house.[5] Ms. Jones testified that when she picked them up Appellant was wearing dark clothing, had a stocking cap pulled down "real low," and the hood of his black sweatshirt was pulled up and drawn over his face. Mr. Galbreath then directed Ms. Jones to drive to a wooded area, where Appellant got out of the car and walked away. When Ms. Jones asked Mr. Galbreath what they were

doing, he told her they were there "to scare some girl...." " Mr. Galbreath and Ms. Jones then went to a convenience store; however, Mr. Galbreath repeatedly spoke to someone on his cell phone and Ms. Jones heard him say, "What's going on? What can you see? How's everything going?" Mr. Galbreath then directed Ms. Jones to return to the location where they had dropped off Appellant. When they got back to that area, Mr. Galbreath told Ms. Jones to go up to the door of a certain house and ask if "Tammy Franklin" was home. Ms. Jones did as she was told. The man who answered the door told her Tammy Franklin did not live there, but she might try a different house. While she was inquiring, Ms. Jones noticed a "bigger" woman dressed in a white t-shirt and black pants inside the home. When she returned to her vehicle, a white Acura, Mr. Galbreath asked her if she saw anyone inside the house and again told her to drive to a convenience store. Mr. Galbreath again placed a cell phone call, but started "freaking out" when he was unable to reach the person he was trying to call.

The record also reveals they again returned to the location where they had left Appellant. When Ms. Jones parked her vehicle, Mr. Galbreath produced a silver semi-automatic gun and he then placed another cell phone call. Ms. Jones heard Mr. Galbreath say "You're in. You're in," and then he referred to Victim by name, telling the caller "she's kind of bigger" and wearing a white t-shirt. Mr. Galbreath

---

**2.** In order to protect the identity of Victim and her family we will refer to her family members only by their first names.

**3.** According to the record, Mr. Young's drug supplier was a man named Robert Jones, who was known as "Boo." Boo would often provide illegal drugs to Mr. Young without Mr. Young having to pay for them up front.

**4.** Boo and Mr. Galbreath were thereafter arrested for their role in kidnapping Mr. Young.

**5.** Ms. Jones testified that Mr. Galbreath did not have a job, but always carried thousands of dollars in cash with him. She related she had heard Mr. Galbreath was a drug dealer and had been told he was the largest drug dealer in the area. She also testified Appellant and Mr. Galbreath were "friends."

then discussed with the caller that there were children in the home and then he told the caller to "do them all in." Ms. Jones had just started driving again when she heard gunshots. Mr. Galbreath told her to stop in front of the house that she had approached earlier. It was then that Appellant ran out of the house, jumped in the vehicle, and told her to "[g]o!" Mr. Galbreath asked Appellant what had happened inside the home and Appellant said "two shots to the head. She's dead." Appellant then said "he put [the kids] in a room across from the refrigerator ... and they didn't see anything."

Mr. Galbreath informed Ms. Jones that it was "11:06" and he "need[ed] to be made public." The group went to Gerbes' supermarket and Appellant and Mr. Galbreath went inside.[6] Thereafter, they went to someone's house where Appellant changed clothes and then they went to a local bar. As they were going into the bar, Ms. Jones heard Appellant and Mr. Galbreath discuss what to do with the gun, which Appellant apparently discarded in a trash bin behind a nearby bar. After playing pool for an hour, Mr. Galbreath paid for four hours of pool and obtained a receipt. Mr. Galbreath and Ms. Jones then spent the night at a local motel. While at the motel, Mr. Galbreath gave his cell phone, which was registered in Ms. Jones's name, back to her and said, "You've had it for at least four days." [7]

On the same evening, Victim was at her home along with her brother, Marcus; her niece, Rachel; and her nephew, Daniel. They were watching a movie when they heard a knock at the door. When Marcus answered the door, a "young," "nervous," white woman asked if "Tammy Franklin" was at home. Marcus told her he did not know anyone by that name, but that she should try the house next door. When he was speaking with the girl he noticed a two-door white vehicle parked in the driveway that looked like an Acura.

After the woman departed, the group returned to watching the movie. At around 10:50 p.m., Marcus left Victim's house and as he was driving away he passed a white car similar to the one he had seen at Victim's home earlier in the evening. A few minutes later Victim's nephew, Daniel, decided he would also leave. When Daniel opened the front door of Victim's home, a black man, wearing a dark hooded sweatshirt with the hood up, pointed a black revolver in his face. The man told Daniel and Victim to get on the floor. Victim immediately knew the situation had something to do with the fact that she had gone to the police when Mr. Young was kidnapped and she felt this man was there to kill her. When the man asked Victim her name, she gave him a different name. The man made Daniel and Rachel move toward the patio doors and lie down. The man called somebody on his cell phone and said, "I don't know if it's her." He asked the person on the phone if the person he was looking for was "a bigger girl" and asked what he should do about children being present. Victim heard the person on the phone say that the man should "kill them all." When the man got off the phone, he said to Victim, "Are you trying to play me ... play games with

---

**6.** A surveillance video from Gerbes' supermarket was shown at trial. The videotape shows Appellant, wearing a dark hooded sweatshirt, and Mr. Galbreath shopping at the supermarket shortly before midnight on the evening of December 28, 2004.

**7.** The police analyzed Ms. Jones's cell phone for DNA evidence. When they compared DNA recovered from the cell phone with Appellant's DNA, the police were unable to eliminate Appellant as contributing to the DNA on the cell phone. Additionally, the police found Appellant's fingerprints in Ms. Jones's car.

me?" The man then shot Victim in the head. According to Daniel, Victim screamed and there was a short pause before there was another gunshot.[8] Daniel waited until he thought the man was gone before he and Rachel ran into the garage and called the police.

When the police arrived on the scene, they found Victim lying in the kitchen floor in a pool of blood with a single gunshot wound to the left frontal area of her head. Victim was flown by helicopter to the University of Missouri–Columbia Hospital where she remained for over two months. As a result of her injuries, Victim has suffered speech problems, personality changes, and can no longer work as a school teacher.

Appellant did not testify at trial.

At the close of all the evidence, Appellant was found guilty of assault in the first degree, armed criminal action, burglary in the first degree, and unlawful use of a weapon. He was sentenced as previously set out. This appeal followed.

In Appellant's first point relied on he maintains the trial court erred and clearly abused its discretion in overruling his objection and allowing Mr. Young's prior preliminary hearing testimony to be read to the jury when Mr. Young was unavailable for trial. Specifically, Appellant argues "Mr. Young's former testimony was hearsay and was taken in a non-trial pro-

ceeding before [Appellant] was provided any discovery, thus failing to provide [Appellant] a full and adequate opportunity for cross-examination."[9]

"A trial court has broad discretion to admit or exclude evidence at trial." *State v. Madorie,* 156 S.W.3d 351, 355 (Mo. banc 2005). "This standard of review compels the reversal of a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion." *Id.* "We review trial court decisions regarding the admissibility of evidence 'for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial.'" *State v. Santillan,* 1 S.W.3d 572, 579 (Mo.App. 1999) (quoting *State v. Tokar,* 918 S.W.2d 753, 761 (Mo. banc 1996)). However, "[w]hether a defendant's constitutional rights were violated is a question of law reviewed *de novo*." *State v. Nunnery,* 129 S.W.3d 13, 17 (Mo.App.2004).

Mr. Young had previously testified under oath at the preliminary hearing in this matter and at that time was cross-examined "by three different attorneys...."[10] On the second morning of Appellant's trial, Mr. Young was scheduled to testify; however, outside of the jury's presence, the State announced Mr. Young was unavailable to testify. Sergeant Greg Sellers ("Sergeant Sellers"), an officer with the Camden County Sheriff's Department, tes-

---

8. Police later recovered a spent bullet from the floor of Victim's home. The bullet found at Victim's home matched a bullet the police recovered from Boo's house which was fired from a black .38 revolver owned by Mr. Galbreath.

9. We note that in the argument portion of his brief Appellant asserts for the first time that his rights were violated because the "jury was completely deprived of the opportunity to observe Mr. Young and to judge his credibility and demeanor." This argument was not raised in his objection before the trial court or

in his motion for new trial. A claim of error not raised in a motion for new trial is not preserved for our review. *State v. Pennington,* 24 S.W.3d 185, 188 (Mo.App.2000). Accordingly, we shall not address that issue in this opinion.

10. As best we can discern, it appears that the same preliminary hearing was used to determine whether there was probable cause to bind over Appellant, Mr. Galbreath and Boo for trial.

tified Mr. Young had been living in Florida and flight arrangements had been made for him to return to Missouri to testify at trial. On March 17, 2006, Mr. Young contacted Sergeant Sellers and asked if he could change his flight so that he could visit family in Arkansas on the way to Missouri. Sergeant Sellers told Mr. Young he would be responsible for making those arrangements. On March 27, 2006, Sergeant Sellers went to the airport to meet Mr. Young's plane and Mr. Young never arrived. He was able to contact a friend of Mr. Young's in Florida and was told Mr. Young had taken a bus to Arkansas. Sergeant Sellers contacted Mr. Young's mother in Little Rock, Arkansas, and she told him she had not seen Mr. Young. Sergeant Sellers had been trying continuously to contact Mr. Young through his family members and law enforcement authorities in other jurisdictions, but was unable to locate him.

Following Sergeant Sellers testimony, the State announced it would like to offer Mr. Young's preliminary hearing testimony into evidence because he was unable to testify at trial.[11] The trial court ruled that "sufficient effort was made, that the witness is unavailable, and specifically that the transcript of the preliminary hearing where Mr. Young testified may be utilized." There was no objection from Appellant's counsel on this issue at that time.

Later, when the State attempted to read the transcript from the preliminary hearing into evidence, Appellant's counsel objected "on the basis that at this stage of the case it was a preliminary nature, the burden of proof of a preliminary hearing is less than a reasonable degree" and they "didn't have discovery at that time" such that "any cross-examination that is afforded was insufficient because of the lack of discovery...." The State countered that "[t]he rule is not how meaningful the cross-examination was but the opportunity for cross-examination." The trial court ruled the reading of Mr. Young's preliminary hearing testimony would be allowed and it noted defense counsel's objections.

■ Under the Confrontation Clause of the Sixth Amendment, the accused has the right to be confronted with the witnesses against him. *State v. Costa,* 11 S.W.3d 670, 679 (Mo.App.1999); *see Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). " '[T]he opportunity to cross-examine is indispensable to the exercise of the right, while the opportunity for the jury to observe the witness is an interest which gives way to considerations of necessity—as where the witness is unavailable.' " *State v. Aaron,* 218 S.W.3d 501, 507 (Mo.App.2007) (quoting *State v. Lindsay,* 709 S.W.2d 499, 504 (Mo. App.1986)). "Where ... witnesses become unavailable between the preliminary hearing and trial, the testimony offered at that [preliminary] hearing takes on an additional significance." *Aaron,* 218 S.W.3d at 509.

The Supreme Court of Missouri held in *State v. Griffin,* 848 S.W.2d 464, 470 (Mo. banc 1993):

Testimony given at a properly held preliminary hearing satisfies the requirements of the confrontation clause of the Sixth Amendment when the witness is unavailable to testify at trial. While the scheduling of the preliminary hearing makes it preferable to have live testimony at trial rather than reading into the trial record the transcript of the testimony at the preliminary hearing for the

---

11. *The general substance of Mr. Young's preliminary hearing testimony related to drug use and narcotics distribution by Boo and Mr.* Galbreath *as well as details relating to his kidnapping in early December.*

very reason that discovery cannot be completed before such a hearing, the inability of defense counsel to conduct the same cross-examination early in the pretrial process as would be conducted at trial does not mean that the testimony lacks sufficient reliability to admit it for trial.

(internal citations omitted) (internal footnote omitted); *see also State v. Hedges,* 193 S.W.3d 784, 787 (Mo.App.2006). "The core principle of the *Crawford* decision requires that 'prior trial or preliminary hearing testimony is admissible only if the defendant had an adequate opportunity to cross-examine.'" *Aaron,* 218 S.W.3d at 506 (quoting *Crawford,* 541 U.S. at 57, 124 S.Ct. 1354). Thus, "[w]here the initial opportunity to cross-examine a witness is sufficient to provide substantial compliance with the right to meet witnesses 'face to face,' subsequent admission of that testimony at trial offends neither the Missouri Constitution nor its federal counterpart." *Aaron,* 218 S.W.3d at 507.

Here, Appellant's principle complaint relates to the fact that the preliminary hearing occurred at a time when discovery was not completed in this matter and had, in fact, just begun. This issue was specifically addressed in both *Griffin,* 848 S.W.2d at 470, and *Aaron,* 218 S.W.3d at 507–10.

In *Aaron,* the preliminary hearing testimony of a witness who died prior to trial was admitted into evidence despite a confrontation clause objection by defense counsel. *Id.* at 505. One of the defendant's arguments on appeal was that he was given an inadequate opportunity to cross-examine the unavailable witness because at the time of the hearing the right to discovery had not attached per Missouri Court Rules. *Id.* at 508. Noting "the practical impossibility of providing a criminal defendant with impeachment evidence prior to the preliminary hearing," the *Aar-*

*on* court referenced the finding in *Griffin* that "'the inability of defense counsel to conduct the same cross-examination early in the pretrial process as would be conducted at trial does not mean that the testimony lacks sufficient reliability to admit it for trial.'" *Aaron,* 218 S.W.3d at 510 (quoting *Griffin,* 848 S.W.2d at 470).

In analyzing whether *Griffin,* 848 S.W.2d at 470, a pre-*Crawford* case, comports with *Crawford,* 541 U.S. at 57, 124 S.Ct. 1354, the *Aaron* court found that "[b]ecause *Griffin* can be broadly read to hold that preliminary hearing cross-examination—even in the absence of the sort of disclosures that discovery would produce—is adequate for confrontation purposes, *Griffin* is not plainly in conflict with *Crawford.*" *Aaron,* 218 S.W.3d at 511. Accordingly, the court found that "the absence of discovery before the preliminary hearing at issue did not render [the unavailable witness's] testimony inadmissible at trial." *Id.; accord, State v. Smith,* 240 S.W.3d 753, 755 (Mo.App. E.D. 2007).

■ In the present matter, Mr. Young's testimony "was given before a judicial tribunal" where he "was sworn and testified" in the presence of Appellant, who "had an opportunity for cross-examination," and where the "parties and issues were substantially the same as in the case on trial...." *Aaron,* 218 S.W.3d at 506. Mr. Young was then clearly unavailable to testify at the trial in this matter. Appellant had the opportunity at the preliminary hearing to confront and cross-examine Mr. Young and the opportunity at trial to present evidence impeaching Mr. Young's credibility. As such, the purposes of the confrontation clause of the Sixth Amendment were fulfilled by the preliminary hearing testimony in this case. Accordingly, in that Appellant was afforded an opportunity to cross-examine Mr. Young at the preliminary hearing and he actually availed

himself of that opportunity through counsel, we conclude that Appellant's constitutional rights and the principles of *Crawford,* 541 U.S. at 57, 124 S.Ct. 1354, were not violated.[12] The trial court did not abuse its discretion in allowing Mr. Young's preliminary hearing testimony to be read to the jury. Point denied.

In his second point relied on Appellant asserts the trial court abused its discretion and plainly erred in permitting the State "to elicit evidence from [Ms. Jones about Mr.] Galbreath's gang membership and activity" because such "testimony violated [Appellant's] rights to due process of the law, to a fair trial, and to be tried only for the offenses charged...." He maintains this evidence was prejudicial to Appellant; was not necessary to paint a complete picture of the events; and enabled the State to portray Appellant as a person of "bad character," which "impermissibly distracted the jury from its sworn duty of deciding if the [S]tate had proven [Appellant's] guilt beyond a reasonable doubt and instead lead the jury to the conclusion that [Appellant] must be guilty of the charged offenses."

 "It is generally recognized that a criminal defendant has a right to be tried only for the offense for which he is charged." *State v. Johnson,* 161 S.W.3d 920, 924 (Mo.App.2005). "'The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is not admissible for the purpose of showing the propensity of the defendant to commit such crimes.'" *Id.* (quoting *State v. Burns,* 978 S.W.2d 759, 761 (Mo. banc

1998)). "To violate the rule prohibiting evidence of other crimes or misconduct by the accused, the evidence must show the accused committed, was accused of, was convicted of, or was definitely associated with, the other crimes or misconduct." *State v. Ponder,* 950 S.W.2d 900, 911–12 (Mo.App.1997).

A trial court has broad discretion to admit and exclude evidence at trial, and error will be found only if this discretion was clearly abused. *State v. Hall,* 982 S.W.2d 675, 680 (Mo. banc 1998). "A trial court abuses its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Biggs,* 91 S.W.3d 127, 133 (Mo.App.2002). "If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Id.*

 As explained below, Appellant concedes he did not object to any of Ms. Jones's testimony at trial regarding Mr. Galbreath's involvement in gang activity; lack of employment; his driving an expensive car; and his carrying "lots" of cash. Neither did Appellant object to Ms. Jones's testimony that Mr. Galbreath was a drug dealer. "'Failure to object at the earliest opportunity to the admission of evidence constitutes a waiver of the claim.'" *State v. Campbell,* 147 S.W.3d 195, 205 (Mo.App.2004) (quoting *State v. Mahoney,* 70 S.W.3d 601, 605 (Mo.App.2002)). Thus, he requests this Court review his claim for plain error under Rule 30.20.[13]

---

12. We note that in his motion for new trial filed with the trial court, Appellant admits Mr. Young's prior testimony pertained to "an unrelated matter not involving [Appellant] in any way." In our review of Mr. Young's testimony, he mentions Appellant on a few

occasions, but directs most of his testimony to his kidnapping at the hands of Mr. Galbreath and Boo—an event Appellant was not involved in.

13. All Rule references are to Missouri Court Rules (2007).

■ Plain error review is used sparingly and is limited to those cases where there is a strong, clear demonstration of manifest injustice or miscarriage of justice. *State v. Ballard*, 6 S.W.3d 210, 214 (Mo.App.1999). Claims of plain error are reviewed "under a two-prong standard." *State v. Roper*, 136 S.W.3d 891, 900 (Mo.App.2004). "In the first prong, we determine whether there is, indeed, plain error, which is error that is 'evident, obvious, and clear.'" *Id.* (quoting *State v. Scurlock*, 998 S.W.2d 578, 586 (Mo.App.1999)). "If so, then we look to the second prong of the analysis, which considers whether a manifest injustice or miscarriage of justice has, indeed, occurred as a result of the error." *Id.* "A criminal defendant seeking plain error review bears the burden of showing that plain error occurred and that it resulted in a manifest injustice or miscarriage of justice." *Id.* "The outcome of plain error review depends heavily on the specific facts and circumstances of each case." *Id.* "When guilt is established by overwhelming evidence, no injustice or miscarriage of justice results requiring relief under the rule." *State v. Comte*, 141 S.W.3d 89, 94 (Mo.App.2004).

At trial, during the State's direct examination, Ms. Jones was asked about her knowledge of gang activity on the part of Mr. Galbreath. While she related that Mr. Galbreath told her "he was a member of the Gangster Disciples" and that the gang had a specific handshake they used when they greeted other members, she, nevertheless, related she couldn't remember having ever seen *Appellant* make that particular hand symbol. Furthermore, while Ms. Jones also testified at length about Mr. Galbreath's association with drugs and gang activity, she offered no testimony relating to gang activity on the part of *Appellant*. Ms. Jones also testified during cross-examination that she had been around Appellant numerous times and had never felt threatened by him.

■ Generally, mere evidence of gang membership, without more specific evidence, is too vague to constitute evidence of prior crimes or bad acts. *State v. Willis*, 10 S.W.3d 156, 158 (Mo.App.1999). Furthermore, "'[t]o violate the rule prohibiting evidence of other crimes or misconduct by the accused, the evidence must show the accused committed, was accused of, was convicted of, or was definitely associated with, the other crimes or misconduct.'" *State v. Bolds*, 11 S.W.3d 633, 638 (Mo.App.1999) (quoting *Ponder*, 950 S.W.2d at 911–12).

■ It has long been held that "'[t]he defendant bears the burden of showing that the challenged testimony constituted evidence of other crimes.'" *State v. Destefano*, 211 S.W.3d 173, 179 (Mo.App.2007) (quoting *State v. Wallace*, 952 S.W.2d 395, 397 (Mo.App.1997)). Appellant has not carried that burden in the present case.

■ Evidence of uncharged misconduct is admissible if it tends to establish motive, intent, identity, the absence of mistake or accident, or a common scheme or plan. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). Likewise, evidence of uncharged misconduct that is part of a sequence of events surrounding the charged offense is also admissible if it helps present a complete and coherent picture of the events that transpired. *State v. Morrow*, 968 S.W.2d 100, 107 (Mo. banc 1998). Here, the State used the kidnapping of Mr. Young and subsequent arrest of Mr. Galbreath as Mr. Galbreath's motive for instructing Appellant to shoot Victim. While Appellant maintains the State did not need the evidence of gang activity to prove motive, he, nevertheless, concedes in his brief, "[t]here was absolutely no evidence that the Gangster Disciples were

involved in either the kidnapping of Mr. Young or the assault of [Victim]." Likewise, there was no definitive evidence offered by Ms. Jones that Mr. Galbreath had committed any specific crimes and Mr. Galbreath was not on trial in this matter. Also, Ms. Jones offered no testimony that Appellant had committed any crimes, misconduct or had even been involved with the Gangster Disciples. Further, as previously related, Ms. Jones specifically testified she did not remember ever seeing Appellant utilize the Gangster Disciples gang sign and she had never felt threatened by him. Appellant has not shown Ms. Jones's testimony constituted impermissible evidence of other uncharged crimes or misconduct or otherwise was unduly prejudicial to Appellant.

■ Furthermore, we note that a significant portion of the testimony relating to Mr. Galbreath's drug activity was elicited during cross-examination of Ms. Jones by *Appellant's* counsel. It has long been held that "[a] defendant cannot be prejudiced by admission of objectionable evidence if he offers similar evidence." *State v. Holmes*, 978 S.W.2d 440, 442 (Mo.App. 1998). Moreover, we discern that it was Appellant's trial strategy to portray Mr. Galbreath as negatively as possible, because Appellant's defense was that he did not shoot Victim and was a tangential player in this matter. Now that his trial strategy has not borne fruit, Appellant cannot be heard to complain. *Aaron*, 218 S.W.3d at 508. "[C]ourts will normally not grant relief for acts or omissions by counsel viewed as trial tactics." *State v. Samuels*, 965 S.W.2d 913, 916 (Mo.App.1998). Furthermore, an Appellant cannot seek plain error review arising from failed tactical and strategic decisions made at trial. *See State v. Hamilton*, 892 S.W.2d 774, 780 (Mo.App.1995).

Based on the foregoing, we cannot say reasonable persons could differ about the propriety of the action taken by the trial court and it cannot be said that the trial court abused its discretion in permitting Ms. Jones's testimony relating to Mr. Galbreath and his gang activities. *Biggs*, 91 S.W.3d at 133. Appellant has failed to prove the trial court committed "error that is 'evident, obvious, and clear.'" *Roper*, 136 S.W.3d at 900 (quoting *Scurlock*, 998 S.W.2d at 586). We decline plain error review. Point Two is denied.

The judgment of the trial court is affirmed.

RAHMEYER and T. SCOTT, SR., JJ., concur.